918 P.2d 561

In the Matter of the Application of HA-WAIIAN ELECTRIC COMPANY, INC. for approval to commit funds in excess of $500,000 for Item BT–849, construction of Waiau–CIP 138 kV # 1 & # 2, Part 2, transmission lines; for Item UM–844, undergrounding of distribution lines and services along Kamehameha Highway; and for a waiver of rule 14 of HECO's tariff to allow HECO to pay for Item UM–844 service conversions.

No. 18156.

Supreme Court of Hawai'i.

June 18, 1996.

As Amended July 11, 1996.

**461**

Colleen H. Sakurai (of Sakurai & Sing) and Stephen W.H.A. Lee (of Ching & Lee), on the briefs, Honolulu, for intervenors-appellants Eloise Yamashita Tungpalan, Brian Kanno, Dennis M. Nakasato, Randall Y. Iwase, Paul T. Oshiro, Julie R. Duldulao, Roy M. Takumi, Samuel S.H. Lee, Henry H. Peters, Peter K. Apo, Annelle C. Amaral, Arnold Morgado, Jr., John Desoto and Rene Mansho.

Thomas W. Williams, Jr. and Craig I. Nakanishi (of Goodsill Anderson Quinn & Stifel), and W. Patrick Fligg, Corporate Attorney (of Hawaiian Electric Co., Inc.), on the briefs, Honolulu, for petitioner-appellee Hawaiian Electric Company, Inc.

Jan N. Sullivan (of Takeyama & Sullivan), on the briefs, Honolulu, for intervenor-appellant Village Park Community Association joins in intervenors-appellants' opening brief.

Rodney I. Kimura, Deputy Attorney General, for appellee Consumer Advocate joins in petitioner-appellee's answering brief.

Before MOON, C.J., KLEIN, LEVINSON and RAMIL, JJ., and HUDDY, Circuit Judge, in place of NAKAYAMA, J., recused.

RAMIL, Justice.

Intervenors–Appellants Eloise Yamashita Tungpalan, Brian Kanno, Dennis M. Nakasato, Randall Y. Iwase, Paul T. Oshiro, Julie R. Duldulao, Roy M. Takumi, Samuel S.H. Lee, Henry H. Peters, Peter K. Apo, Annelle C. Amaral, Arnold Morgado, Jr., John DeSoto, and Rene Mansho (Tungpalan or the Tungpalan Appellants), and Village Park Community Association [1] (VPCA) (collectively Appellants) appeal from the Public Utilities Commission's (PUC or Commission) decision and order granting the Petitioner–Appellee's (Hawaiian Electric Company, Inc. or HECO) application to commit funds in excess of $500,000 for the construction of high-voltage overhead transmission lines, and undergrounding of certain distribution lines, and overhead to underground service conversions. On appeal, Appellants contend that: (1) the PUC violated the Hawai'i Administrative Procedure Act (HAPA) by failing to promulgate rules properly to establish when transmission lines will be placed underground; (2) the PUC improperly engaged in rule-making in its decision and order; (3) the PUC acted arbitrarily and capriciously in adopting its position on prudent avoidance and electronic magnetic fields (EMFs); (4) the PUC did not consistently apply its standard and used its authority arbitrarily and

1. VPCA filed a joinder in the Tungpalan Appellants' Opening Brief on October 17, 1994. A motion for withdrawal and substitution of counsel was filed on November 10, 1994, whereby then counsel for VPCA withdrew and the Tungpalan Appellants' counsel was substituted as counsel for VPCA.

462

capriciously; (5) HECO failed to meet its burden of proof in this proceeding;[2] and (6) the PUC deferred to other governmental agencies contrary to the PUC's preemptive rights.[3] For the reasons below, we affirm the PUC's decision and order.

## I.  BACKGROUND

On March 12, 1992, HECO filed an application[4] for approval to commit (1) $31,040,600[5] for item BT–849, the construction of Waiau–Campbell Industrial Park (Waiau–CIP) 138 kilovolt ("kV") numbers 1 and 2, part 2, overhead transmission lines from the Ewa Nui substation to Waiau power plant; and (2) $5,658,100 for item UM–844, the underground placement of distribution lines and certain overhead to underground service conversions along Kamehameha Highway.[6] These lines were designed to provide electri-

2.  Upon review of the record, we hold that the H–1 overhead alignment is reasonable and in the public interest.  In light of (1) the presumption of validity we accord to decisions of administrative bodies acting within their sphere of expertise; and (2) the heavy burden imposed on the appellant of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences, see part II, infra, we further hold that Appellants' contention that HECO failed to meet its burden of proof in this proceeding is without merit.

3.  We hold that Appellant's sixth contention is also without merit.  There is nothing in the PUC's decision indicating that the PUC deferred to another governmental agency.  HECO decided that the H–1 overhead alignment was preferred over the Farrington overhead alignment because it was unlikely that the State Department of Transportation (DOT) would issue a permit allowing transmission lines over Farrington Highway, the alternative location.  The PUC determined that HECO carried its burden of showing that the H–1 alternative was reasonable, in light of cost, construction time, reliability, aesthetics, depreciation of property values, and other factors.  This conclusion was reached by balancing several factors, not by deferring to the decision of another agency.

Under its franchise, HECO has a right to use public rights of way for its transmission and distribution facilities.  At the same time, the rights of way may be used for other governmental and public utility facilities.  This is not a case where HECO had no alternative alignment for its transmission lines.  Moreover, this is not a case in which another governmental agency sought to regulate the configuration of the lines in a manner conflicting with the PUC's rules for overhead line construction.

Appellants' reliance on Citizens Utilities Co. v. County of Kaua'i, 72 Haw. 285, 814 P.2d 398 (1991), is misplaced.  In Citizens, the County of Kaua'i attempted to regulate the height of utility poles by defining them under the term "structures" appearing in HRS § 46–4.  The PUC already regulated the minimum heights of electric poles in General Order No. 6.  The court held that the legislature intended to reserve the power to regulate public utilities to the PUC and therefore had preempted the power of the counties to regulate the height of utility poles.  Id. at 288, 814 P.2d at 400.

Citizens is inapposite to this case inasmuch as the PUC's preemptive power over cities or counties is not at issue.  In addition, it is entirely reasonable for HECO, and the PUC reviewing HECO's routing selection, to take into account concerns about the permitting of a project alternative, particularly when an immediate need for the project is demonstrated.  Without some probability that permits can be reasonably obtained from the appropriate government authorities, it would not be reasonable to commit funds to such an alternative.

4.  Public Utilities Commission, Standards for Electric Utility Service in the State of Hawai'i, General Order No. 7, Paragraph 2.3(g)(2) of Title VII provides in pertinent part:

Proposed capital expenditures for any single project related to plant replacement, expansion or modernization, in excess of $500,000 or 10 per cent of the total plant in service, whichever is less, shall be submitted to the Commission for review at least 60 days prior to the commencement of construction or commitment for expenditure, whichever is earlier.  If the Commission determines, after hearing on the matter, that any portion of the proposed project provides facilities which are unnecessary or are unreasonable in excess of probable future requirements for utility purposes, then the utility shall not include such portion of the project in its rate base.

5.  HECO revised this estimate to $29,921,900.  The reduction of approximately $1,118,700 from HECO's original estimate was the result of design changes made by HECO with respect to the Waiau–CIP overhead transmission lines.

The $29,921,900 estimate for item BT–849 includes $5,300,000 in total easement acquisition costs.

6.  The project is specifically described as follows:

1.  Construction of approximately 7.8 miles of two 138 kV alternating current (three phase, 2000 amperes per phase, circuits) overhead transmission lines from the planned Ewa Nui Substation in Ewa to the Waiau Power Plant.  The alignment from Ewa Nui to the H–1/H–2 Interchange will be a double circuit, overhead alignment.  In Pearl City, two overhead single circuit alignments are proposed: one along the

cal power to the increasingly populated Ewa plains.

By an order dated April 22, 1992, the PUC allowed the intervention of Amfac Property Development Corporation and Amfac Property Investment Corporation (collectively Amfac) and WCC Associates (WCC).[7] By an order dated March 12, 1993, the PUC allowed the intervention of Village Park Association, James Aki, Joseph M. Souki, the Tungpalan Appellants (collectively Aki, et al.), and VPCA.[8] A public hearing was held by the PUC in the Waipahu High School Cafeteria on May 28, 1992. During the public hearing, members of the general public, many of whom were represented by Appellants, voiced their concerns about the project which included: (1) visual impact; (2) electromagnetic radiation coming from the power lines; and (3) degradation of property values. Many argued that the transmission lines should be placed underground.

By Stipulated Prehearing Order No. 11998 filed on October 30, 1992, the following were the issues agreed to by the parties and intervenors:

1. Whether HECO's proposed expenditures for Item Nos. BT–849 and UM–844 will provide facilities which are reasonably required to meet HECO's probable future requirements for utility purposes.

2. Whether HECO's selected routing, location, configuration and method of construction for Item Nos. BT–849 and UM–844 are reasonable and preferable to HECO's other options, comparing the following factors:

    a) Cost;

    b) Construction time;

    c) Health effects, including the effect of EMFs;

    d) Safety;

    e) Aesthetic considerations;

    f) Depreciation of property values;

    g) Interference with radio and television reception; and

    h) The public welfare in general.[9]

3. Whether the underground placement of distribution lines and services along Kamehameha Highway is reasonably required.

4. Whether the Commission should waive the application of Rule 14 of HECO's tariff, to allow the utility to pay for the

Kamehameha Highway and one in the area between the H–1 Freeway and the Kamehameha Highway. (The two new 138 kV lines are identified as the Ewa Nui–Waiau #1 & #2 circuits.).
2. Existing 46 kV lines along the mauka boundary of the H–1 Freeway and along other sections of the alignment will be underbuilt on the new steel poles and where appropriate, the existing wood poles will be removed (where appropriate).
3. Existing 12 kV overhead distribution lines will be placed underground along the makai side of Kamehameha Highway. In other locations, the 12 kV overhead distribution lines will be underbuilt on the new steel poles.
4. Existing overhead service connections will be placed underground along Kamehameha Highway, from the Waiau Power Plant to Kuala Street.
In addition, HECO proposed to commit approximately $290,000 for item ST–737. Although this project was not included in HECO's application, HECO added this project through the rebuttal testimonies of its witnesses George T. Iwahiro and Francis K. Hirakami, filed on March 24, 1993. This project involves the removal of the two 11.5 kV Oahu Sugar Company (OSC) circuits fronting Village Park and service of the loads of these circuits from the existing Ewa substation on Farrington Highway. If HECO does not remove the OSC circuits, the *height of the steel poles would have to be in the* range of 135 feet to accommodate two 138 kV circuits, one 46 kV circuit, and the two OSC circuits. With the OSC circuits removed, HECO projects that the height of the steel poles will be approximately 100 feet.

7. By Order No. 12171, filed on February 4, 1993, the PUC approved the withdrawal of WCC as an intervenor.

8. The PUC permitted Aki, et al. to participate in their individual capacities as affected residents or HECO ratepayers. However, Aki and Souki were not identified as Appellants in the Notice of Appeal filed May 5, 1994 on behalf of the Tungpalan Appellants.

9. Intervenors specifically challenge HECO's analyses of the following factors: cost, construction time, reliability, aesthetics, depreciation of property values, social equity, health effects of exposure to EMFs, and impact on HECO's ratepayers.

underground secondary service conversions as part of Item No. UM–844. (Brackets added.)

All parties later submitted written testimony and documentary evidence, and an evidentiary hearing was held by the PUC over a 14–day period, from April 7, 1993, to May 3, 1993, where oral testimony was taken. After briefs were filed by all parties, the PUC rendered its Order No. 13201, approving HECO's application in its entirety.

In its Order, the PUC cited, *inter alia*, a previous decision, *In re Hawaii Electric Company*, Decision and Order No. 10620, 1990 WL 488795, entered May 8, 1990, in which the PUC articulated the factors that would lead the PUC to require an electric utility to place its transmission lines underground. The PUC stated:

The Commission agrees that laying transmission lines underground promotes aesthetics and preserves scenic views. However, the utility has the responsibility to minimize the cost to ratepayers in providing reliable electric service.... [T]he cost of placing transmission lines underground is very high and the burden of that cost ultimately falls upon the ratepayers. Thus, unless (1) there is a compelling reason (which outweighs the costs) to place the lines underground or (2) there is a stated public policy requiring the lines to be laid underground or (3) the ratepayers as a whole consent to bear the high cost of putting the lines underground, we do not believe that we should require HECO to place the transmission lines underground. That placing the transmission lines overhead may obstruct one's view plane, in and of itself, is not sufficient cause to require the ratepayers to bear the cost of laying the lines underground.

*Id.* at 16.

The PUC order in the present case noted that, in light of Decision & Order No. 10620, HECO's proposed project will cause visual impacts and the emission of EMFs. The PUC concluded, however, that neither factor justified the underground placement of the transmission lines because aesthetics and inconclusive health effects of EMF did not constitute compelling reasons that would out-weigh the added cost of placing the lines underground. The PUC opined that, because every overhead transmission line would have visual impacts and produce EMFs, if it were to order HECO to place the lines underground under the circumstances, it would be setting a precedent that could very well preclude the placement of any overhead transmission lines in Hawai'i.

The PUC found:

Based on the record in this docket and our earlier findings in this decision and order, we make the following ultimate findings:

1. HECO's proposed expenditures for item BT–849 and item UM–844 will provide facilities that are reasonably required to meet HECO's probable future requirements for utility purposes.

2. HECO's selected routing, location, configuration, and method of construction for item BT–849 are reasonable and preferable to HECO's other options, comparing the following factors: cost; construction time; health effects, including the effect of EMF; safety; aesthetic considerations; depreciation of property values; interference with radio and television reception; and the public welfare in general.

3. Item UM–844, the underground placement of distribution lines and services along Kamehameha Highway, is reasonably required.

4. A waiver of rule 14 of HECO's tariff to allow HECO to pay for the underground secondary service conversions as part of item UM–844, is reasonably required.

5. Item ST–737, the removal of the two 11.5 kV OSC circuits fronting Village Park and services of the loads of these circuits from HECO's existing Ewa substation on Farrington Highway, is reasonably required.

This timely appeal followed.

## II. STANDARD OF REVIEW

Under the provisions of HRS § 269–16(f) (1993), an appeal from a "final" order of the PUC is taken to the supreme court. *In re*

*Kaanapali Water Corp.,* 5 Haw.App. 71, 76, 678 P.2d 584, 588 (1984). In such an appeal, the standard of review is set forth in HRS § 91–14(g) (1993).[10] *In re Miller and Lieb Water Co., Inc.,* 65 Haw. 310, 311, 651 P.2d 486, 488 (1982).

In *Outdoor Circle v. Harold K.L. Castle Trust Estate,* 4 Haw.App. 633, 638, 675 P.2d 784, 789 (1983), the Intermediate Court of Appeals (ICA) said that HRS § 91–14(g) requires that, in order for the court to revise or modify an agency decision, it must find that an appellant's substantial rights may have been prejudiced by an agency under one of the six subsections of the statute. The ICA also held that, under HRS § 91–14(g), conclusions of law are reviewable under subsections (1), (2), and (4); questions regarding procedural defects under subsection (3); findings of fact under subsection (5); and an agency's exercise of discretion under subsection (6). *Id.*

■ In *In re Application of Hawaii Electric Light Co.,* 60 Haw. 625, 629, 594 P.2d 612, 617 (1979), the supreme court further limited judicial review of administrative decisions by stating:

> In order to preserve the function of administrative agencies in discharging their delegated duties and the function of this court in reviewing agency determinations, a presumption of validity is accorded to decisions of administrative bodies acting within their sphere of expertise and one seeking to upset the order bears "the heavy burden of making a convincing showing that it is invalid because it is unjust and unrea-

sonable in its consequences." *Federal Power Commission v. Hope Natural Gas Co.,* 320 U.S. 591, 602 [64 S.Ct. 281, 288, 88 L.Ed. 333] (1944), *quoted in In re Application of Kauai Electric Division,* 60 Haw. [166, 187], 590 P.2d [524,] 538 (1978); *Savannah Electric and Power Co. v. Georgia Public Service Commission,* [239 Ga. 156] 236 S.E.2d 87 (1977); *Louisiana Power & Light Co. v. Louisiana Public Service Commission,* 343 So.2d 1040 (1977); *Alabama Gas Corp. v. Wallace,* [293 Ala. 594] 308 So.2d 674 (1975).

(Brackets added.)

■ Additionally, courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of fact by passing upon the credibility of witnesses or conflicts in testimony, especially the findings of an expert agency dealing with a specialized field. *In re Hawaii Electric Light Co.,* 60 Haw. at 629, 594 P.2d at 617.

## III. *DISCUSSION*

### A.

Appellants generally contend that the PUC violated HAPA[11] by failing to properly promulgate rules to establish when transmission lines will be placed underground. Appellants argue that, prior to proceeding with the case, the PUC should have issued a "rule," as defined by HRS § 91–1(4) (1993), as to when the PUC will defer to another governmental agency, as to when power lines will be under-

---

**10.** HRS § 91–14(g) (1993) provides:

Judicial review of contested cases.

\*    \*    \*    \*    \*    \*

(g) Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:

   (1) In violation of constitutional or statutory provisions; or

   (2) In excess of the statutory authority or jurisdiction of the agency; or

   (3) Made upon unlawful procedure; or

   (4) Affected by other error of law; or

   (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or

   (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

**11.** The HAPA was enacted in 1961, "to provide a uniform administrative procedure for all state and county boards, commissions, departments or offices which would encompass the procedure of rule making and adjudication of contested cases." Hse. Stand. Comm. Rep. No. 8, in 1962 House Journal, at 653. The act is dichotomized to establish different procedures to be followed by state and county agencies in establishing rules and regulations and in adjudicating contested cases, and is patterned after the Revised Model Administrative Procedure Act. *Id.* at 655.

grounded, as to how the visual impact of overhead lines will be weighed, and to define when transmission lines will be placed underground for social equity reasons. The PUC instead granted HECO's application, merely stating that it needed "additional justification"[12] to place lines underground for social equity reasons. Appellants argue that what would qualify as "additional justification" or criteria is clearly a statement of policy by the PUC, thereby requiring a rule-making proceeding prior to a contested case hearing under HAPA.

Under HRS § 91–1(4), a "rule"

means each agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy, or describes the organization, procedure, or practice requirements of any agency.

HRS § 91–1(4) (1993).

■■■■ We begin our discussion by first recognizing the distinction between rule-making and adjudication.

The distinction between rule-making and adjudication is often troublesome statutory language. However, it is generally accepted that the distinguishing characteristic of rule-making is the generality of effect of the agency decision and that literal application of the words "or particular" would obviate completely the adjudicatory functions of administrative agencies. [*Aguiar v. Hawaii Housing Authority*, 55 Haw. 478, 485 n. 13, 522 P.2d 1255, 1261 n. 13 (1974)]; 1 Davis, *Administrative Law Treatise* § 5.02 (1958) (hereinafter "Davis").

This distinction [between rule-making and adjudication] reflects the consideration that in rule-making policy is dominant, rather than accusatory or disciplinary elements, and consequently such factors as the demeanor of witnesses are of little significance.

\* \* \* \* \* \*

Rule-making is an agency action governing the future conduct either of groups of persons or of a single individual; it is essentially legislative in nature, not only because it operates in the future, but also because it is concerned largely with considerations of policy. In rule-making, disciplinary or accusatory elements are absent. Typically, the issues relate not to the evidentiary facts, as to which the demeanor of witnesses would often be important, but rather as to the inferences to be drawn from the facts or as to the predictions of future trends to be based upon them.

\* \* \* \* \* \*

Adjudication, conversely, is concerned with the determination of past and present rights and liabilities. Typically, there is involved a determination as to whether past conduct was unlawful, so that the proceeding is characterized by an accusatory flavor and may result in disciplinary action. Inevitably, in such proceedings, issues of fact often are sharply controverted, with the consequence that the demeanor of witnesses becomes important and should be observed by an agency officer who will play a substantial role in the decision.

Note, *"Rule Making," "Adjudication" and Exemptions Under the Administrative Procedure Act,* 95 U. Pa. L.Rev. 621 (1946–47).

In his treatise on administrative law, Professor Davis writes:

One of the most helpful definitions of rule-making is that of Professor Fuchs, who concludes that rule-making should be defined as 'the issuance of regulations or the making of determinations which are addressed to indicated but unnamed and unspecified persons or situations.' Another definition is that of Mr. Dickinson: 'What distinguishes legislation from adjudication is that the former affects the rights of individuals in the abstract and must be applied in a further proceeding before the legal position of any particular individual will be definitely touched by it; while adjudication oper-

---

12. We interpret "additional justification" to mean the numerous, evolving, and context-specific considerations involved in the review of proposed transmission line projects.

ates concretely upon individuals in their individual capacity.'

1 Davis, *supra,* § 5.01.

*Foster Village Community Ass'n v. Hess,* 4 Haw.App. 463, 475–77, 667 P.2d 850, 858 (1983) (brackets added).

■ Accordingly, because the "literal application of the words 'or particular' would obviate completely the adjudicatory functions of administrative agencies," *id.* at 475, 667 P.2d at 858 (citing *Aguiar,* 55 Haw. at 485 n. 13, 522 P.2d at 1261 n. 13), we reject Appellants' general contention that all statements of policy by the PUC require a rule-making procedure under HAPA prior to proceeding with the case. Rather, we recognize that rule-making is essentially legislative in nature because it operates in the future; whereas, adjudication is concerned with the determination of past and present rights and liabilities of individuals where "issues of fact often are sharply controverted." *See Shoreline Transp., Inc. v. Robert's Tours & Transp.,* 70 Haw. 585, 591, 779 P.2d 868, 872 (1989).

■ Secondly, the choice between proceeding by "general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *Securities and Exchange Commission v. Chenery Corp.,* 332 U.S. 194, 203, 67 S.Ct. 1575, 1580, 91 L.Ed. 1995 (1947). Thus, "most courts have allowed agencies broad discretion in choosing whether to develop policy by rule[-]making or adjudication." *Consumer Protection Division v. Consumer Publishing Co.,* 304 Md. 731, 501 A.2d 48, 60 (1985) (brackets added).

To further elaborate on this rule-making/adjudication distinction, we now address the specific issues on appeal before us.

### 1. *Giving precedential effect to prior commission decisions does not constitute rule-making.*

Specifically, Appellants first contend that the PUC improperly adopted an agency rule establishing "criteria" for the placement of transmission lines underground by referring to and evaluating the factors articulated in a prior transmission line case, *In re Hawaii Electric Company,* Decision and Order No. 10620. In determining whether the PUC may give precedential effect to prior commission decisions, we look to *Shoreline, supra,* for authority.

In *Shoreline,* a motor carrier, authorized to render transportation services over "irregular routes," was conducting a "regular route operation" on Maui. The PUC issued a cease and desist order against the carrier. The ICA set aside the PUC's decision based on its conclusion that the decision was a "rule" of general applicability that was not promulgated in accordance with HAPA. Reversing the ICA decision, this court held that, although the decision and order could be classified as an "agency statement of general or particular applicability and future effect that implements, interprets, or prescribes law or policy," the PUC was correct in following adjudicatory procedures. *Shoreline,* 70 Haw. at 593–94, 779 P.2d at 873 (citing HRS § 91–1(4)).[13]

In holding that administrative decisions made under the PUC's adjudicatory powers can have a precedential effect and be used to guide the PUC in future decisions, the court explained:

> [I]n exercising its quasi-judicial function[,] an agency must frequently decide controversies on the basis of new doctrines, not theretofore applied to a specific problem, though drawn to be sure from broader principles reflecting the purposes of the statutes involved and from the rules invoked in dealing with related problems. If the agency decision reached under the adjudicatory power becomes a precedent, it guides future conduct in much the same way as though it were a new rule promulgated under the rule-making power, and both an adjudicatory order and a formal "rule" are alike subject to judicial review.

779 P.2d at 873 (citations omitted). Thus, the court concluded that the words "or particular" do not change the basic understanding of the difference between rulemaking and adjudication held prior to the adoption of HAPA.

---

13. In interpreting the term "rule," this court also stated in *Shoreline* that the literal application of the words "or particular" would "rob the provisions of HAPA relating to 'adjudication' of virtually all meaning." *Shoreline,* 70 Haw. at 593,

*Shoreline,* 70 Haw. at 591–92, 779 P.2d at 872 (citing *NLRB v. Wyman–Gordon Co.,* 394 U.S. 759, 770–71, 89 S.Ct. 1426, 1432, 22 L.Ed.2d 709 (1969) (Black, J., concurring)).[14]

The United States Supreme Court also addressed this issue in *Chenery, supra,* and in its progeny, *Wyman–Gordon Co., supra,* and *NLRB v. Bell Aerospace Co.,* 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974). In *Chenery,* the Court explained:

> [P]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be resolved despite the absence of a relevant general rule. Or the agency may not have had sufficient experience with a particular problem to warrant rigidifying its tentative judgment into a hard and fast rule. Or the problem may be so specialized and varying in nature as to be impossible of capture within the boundaries of a general rule. In those situations, the agency must retain the power to deal with the problems on a case-to-case basis if the administrative process is to be effective. There is thus a very definite place for the case-by-case evolution of statutory standards.

*Chenery,* 332 U.S. at 202–03, 67 S.Ct. at 1580.

■ As noted in subsequent Supreme Court decisions, "[a]djudicated cases may and do ... serve as vehicles for the formation of agency policies, which are applied and announced therein," and such cases "generally provide a guide to action that the agency may be expected to take in future cases. Subject to the qualified role of *stare decisis* in the administrative process, they may serve as precedents." *Wyman–Gordon Co.,* 394 U.S. at 765–66, 89 S.Ct. at 1429 (emphasis in original). *See Bell Aerospace Co.,* 416 U.S at 294, 94 S.Ct. at 1771.

■ Accordingly, we hold that giving precedential effect to prior commission decisions, *e.g., In re Hawaii Electric Company,*

Decision and Order No. 10620, does not constitute rule-making.

### 2. The PUC's reliance on adjudication was not an abuse of discretion.

■ As we previously noted, agencies are allowed the broad discretion to choose whether to develop policy by rule-making or adjudication. In some circumstances, however, an agency's reliance on adjudication can constitute an "abuse of discretion." *Bell Aerospace Co.,* 416 U.S. at 294, 94 S.Ct. at 1771.

For example, the Ninth Circuit Court of Appeals explained that policymaking by adjudication is an abuse of discretion if: (1) it is used to "circumvent the requirements of the Administrative Procedure Act" by amending a recently amended rule or bypassing a pending rule-making proceeding; or (2) "an agency's sudden change of direction leads to undue hardship for those who had relied on past policy." *Union Flights, Inc. v. Administrator, FAA,* 957 F.2d 685, 688–89 (9th Cir.1992).

### a. The PUC did not circumvent the requirements of HAPA.

■ The recent case of *Aluli v. Lewin,* 73 Haw. 56, 828 P.2d 802 (1992), offers a useful comparison with the present case. In *Aluli,* the appellants sought cessation of construction and operations of geothermal wells along a segment of the Kilauea Middle East Rift Zone. *Id.* at 57, 828 P.2d at 803. The complaint was brought against True/Mid–Pacific Geothermal Venture (True), which was developing the wells, and against the State Department of Health (DOH), which issued an air pollution permit authorizing the construction and operation of the wells. *Id.* The appellants contended that the DOH erred in issuing the permit when there were no rules promulgated in accordance with HRS § 342B–32 governing the issuance of such permits.[15] *Id.* The circuit court ruled

---

**14.** *See also In re Kaanapali Water Corp., supra,* (upholding the commission's adoption of a statement of policy in a contested case proceeding).

**15.** HRS § 342B–32 (Supp.1991) provided that "[t]he director shall refuse to issue the permit unless it appears that the operations would be in compliance with the *rules* of the department and

the state ambient air quality standards." (Emphasis added). HRS § 342B–32 was substantially amended in 1992. For purposes of comparing *Aluli* to the present case, HRS § 342B–32 (Supp. 1991), which was referred to in *Aluli,* is discussed here.

that such administrative rules were unnecessary and denied the appellants' claim for relief. *Id.*

On appeal, this court reversed the circuit court's ruling by holding that the DOH erred in issuing an air pollution permit with emission limits for hydrogen sulfide without promulgating rules governing such emissions. *Id.* at 62, 828 P.2d at 805. The *Aluli* court explained:

Air quality is an integral part of the quality of life and the public should have input in the matter. *The language of HRS § 342B–32 provides for permit issuance in accordance with rules which indicates that the legislature envisioned public input into these matters.*

\*    \*    \*    \*    \*    \*

The fact that the appellants in this case had an opportunity to present their views before the circuit court at trial is clearly not an adequate substitute for the *rule[-]making process required under HRS § 342B–32.* The appellants comprise a small portion of the public. Others may have been interested in providing input in the matter but may not have been able to intervene in this lawsuit due to a lack of notice or resources. Moreover, fairness to the public and potential applicants for air pollution permits dictates that the rules adopted by DOH be known beforehand. This will enable one to plan and make decisions with certainty.

\*    \*    \*    \*    \*    \*

Future applicants will have no official source to turn to for guidance. · There will be no avenue to predict DOH's actions in permit application procedures. Without established written standards by rules, no one can know whether permit applications will be reviewed fairly and consistently and whether considerations to grant or deny a permit will serve the purpose of the statute or are unlawful (*e.g.,* bribes, race discrimination). *See, 613 Corp.* [*v. New Jersey, Div. of State Lottery* ], [210 N.J.Super. 485] 510 A.2d [103,] 112 [ (N.J.Super.A.D.1986) ]; *Crema* [*v. New Jersey Dep't of Envtl. Protection* ], [94 N.J. 286] 463 A.2d [910,] 918 [ (N.J.1983) ]; *White v.*

*Roughton,* 530 F.2d [750,] 753–54 [ (7th Cir.1976) ]; *Gonzalez v. Freeman,* 334 F.2d 570, 578 (D.C.Cir.1964).

*Aluli,* 73 Haw. at 59–61, 828 P.2d at 804–05 (emphasis and brackets added).

No statute similar to HRS § 342B–32 exists in the present case. Furthermore, there is no statutory basis for Appellants' assertion that the issues in this case cannot be resolved by adjudication. Moreover, unlike the case before us, the DOH in *Aluli* was in the process of developing proposed rules when the permit was issued. *Id.* at 58, 828 P.2d at 803. Because the permit specifically regulated emissions that were a subject of rule-making, the DOH's adjudicatory proceeding directly circumvented HAPA's requirements by bypassing a pending rule-making proceeding. *Id.* at 59, 828 P.2d at 803–04.

In addition, it was undisputed in *Aluli* that hydrogen sulfide emissions caused air pollution. *Id.* at 57–58, 828 P.2d at 803. The agency was able to set forth definite air quality standards for emission of hydrogen sulfide. Thus, the development of policy by adjudication was inappropriate in *Aluli* because it was not "doubtful whether any generalized standard could be framed which would have more than marginal utility," and the agency did not have "reason to proceed with caution, developing its standards in a case-by-case manner...." *Bell Aerospace Co.,* 416 U.S. at 294, 94 S.Ct. at 1772.

The present case poses the exact opposite situation because of the uncertainty regarding the health effects of EMF. The PUC stated that underground placement of the transmission lines was not justified because "aesthetics and as yet inconclusive health effects of EMF do not constitute compelling reasons that would outweigh the added cost of placing the lines underground." Moreover, the PUC concluded that agreement with Appellants' position would create a precedent requiring future transmission lines to be placed underground. Because the situations discussed in *Union Flights* and *Aluli* are not applicable to the instant case, we hold that the PUC's reliance on adjudication was not an abuse of discretion.

### b. *Appellants did not suffer undue hardship because they relied on past policy.*

Based on our holding in *In re Hawaiian Electric Co.*, 66 Haw. 538, 669 P.2d 148 (1983), (hereinafter *Lifeline Rates*), we also reject Appellants' contention that the issue of when transmission lines will be placed underground should have first been addressed in a rule-making proceeding.

In *Lifeline Rates*, HECO applied to the PUC for a rate increase. After the appellants urged the adoption of lifeline rates, pursuant to the Public Utility Regulatory Policies Act, the matter was treated as a contested case under HRS chapter 91 by the PUC and all the parties, including the appellants, throughout the proceedings. *Id.* at 539–540, 669 P.2d at 150. On appeal, the appellants argued that, prior to proceeding with the case, the PUC should have issued rules on the subject matter of what proponents of lifeline rates must establish. *Id.* at 541, 669 P.2d at 151. "In this connection, one of their arguments seemed to have been that it was error for the PUC to proceed by way of a contested case hearing (although they did not object thereto) and that the PUC instead should have adopted rules pursuant to HRS § 91–3." *Id.*

The court rejected the appellants' arguments because: (1) the appellants: (a) accepted, without objection, the contested case procedure; (b) took their appeal based on statutes that provide for appeals from the "order" in a contested case; (c) should have proceeded by petition for the adoption of such rule pursuant to HRS § 91–6 if what the appellants desired was the promulgation of a "rule" by the PUC; and (d) received an extensive evidentiary hearing; and (2) detailed findings of fact and conclusions of law were entered. *Id.* at 541–42, 669 P.2d at 151–52. Accordingly, the court held that the

PUC did not err in proceeding with a contested case hearing instead of adopting rules under HRS § 91–3. *Id.* at 542, 669 P.2d at 152.

Similar to the appellants in *Lifeline Rates*, Appellants in the instant case contend that the PUC erred in proceeding by way of a contested case hearing and that the PUC should have first adopted rules pursuant to HRS § 91–3 on the subject matter, specifically, rules to establish when transmission lines will be placed underground. Under the court's analysis in *Lifeline Rates*, we reject Appellants' arguments.

First, Appellants participated in the contested case proceeding without objection and stipulated to the statement of issues in the prehearing order. Second, similar to the appellants in *Lifeline Rates*, Appellants took their appeal based on HRS §§ 91–14 and 269–16(f), which provide for appeals from an "order" in a contested case.[16] Third, if what Appellants desired was the promulgation of a "rule" by the PUC, they should have proceeded by petition for the adoption of such rule pursuant to HRS § 91–6. Appellants had more than ample time to raise their concerns before the PUC during the two years preceding its decision. The PUC then would have been obliged within thirty days either to deny the petition, stating its reasons in writing for the denial, or to initiate proceedings in accordance with HRS § 91–3.[17] Fourth, Appellants have shown no injury that would have been remedied by the PUC promulgating a rule before holding a contested case hearing. The contested case process itself afforded extensive procedural requirements and several advantages, such as the opportunity to examine and cross-examine witnesses. The public was fully apprised of the transmission line proceeding, and the PUC thoroughly accommodated pub-

---

**16.** HRS § 269–16(f) (1993) provides in pertinent part:

> From every order made by the commission under this chapter that is final or, if preliminary, is of the nature defined by section 91–14(a), an appeal shall lie to the supreme court subject to chapter 602 only by a person aggrieved in the contested case hearing provided for under this section in the manner and with-

in the time provided by chapter 602, and by *the rules of court.*

**17.** Had the PUC refused to do so, it may be (although we do not here reach or decide that question) that Appellants would then have had an action in the circuit court of some nature, such as a declaratory judgment action; but they would not have had an appeal, under HRS Chapter 91, to this court.

lic participation. Every person or entity seeking intervention was allowed to become a party, even long after the filing deadline had passed. Every party, including Appellants, had numerous opportunities to marshal evidence in support of their positions. *See* part III.B, *infra.* Lastly, similar to that in *Lifeline Rates*, detailed findings of fact and conclusions of law were entered. *See* part I, *supra; In re Hawaiian Electric Company*, Decision and Order No. 13201 (Apr. 7, 1994). For these reasons, Appellants cannot now be heard to complain that they suffered undue hardship because of reliance on past policy.[18] *See Lifeline Rates*, 66 Haw. at 541–42, 669 P.2d at 151.

Furthermore, it is clear from the factors listed in issue 2 of the stipulated prehearing order, *see* part I, *supra*, that the issue whether to require the placement of transmission lines underground did not lend itself to a rigid formula or rule. As we discussed *supra*, adjudication on a case by case basis is an appropriate method for determining when to route transmission lines underground.

Accordingly, we hold that the PUC did not abuse its discretion when it proceeded by way of adjudication.

### 3. *Appellants' reliance on Ainoa is misplaced.*

▇▇ Appellants rely on *Ainoa v. Unemployment Compensation Appeals Division*, 62 Haw. 286, 614 P.2d 380 (1980), in support of the proposition that the PUC may not adopt rules or definitions through decision.

In *Ainoa*, the Department of Labor and Industrial Relations (DLIR) issued to the Unemployment Compensation Appeals referees statements interpreting the term "available for work," as used in HRS § 383–29(a)(3). The referees, in turn, utilized the statements in determining that the claimants were not "available for work" and therefore not entitled to receive unemployment insurance benefits. The claimants appealed the referees' decision contending that the DLIR

statements were rules under HAPA. The DLIR, in turn, claimed that the statements were judicial constructions of the term "available for work."

On appeal, this court determined that printed statements defining statutory terms and used by hearing examiners to determine the rights of applicants exceeded the standards enunciated in the judicial decisions and were therefore rules. *Id.* at 292, 614 P.2d at 384–85. Moreover, the criteria were established before the hearings in which they were applied, and were not at issue in the hearings. However, the court did not hold, as Appellants in the present case imply, that an agency is precluded from following standards developed in its own decisions or that earlier agency decisions could not be given precedential effect.

Because *Ainoa* does not preclude an agency from giving precedential effect on its earlier decisions or from relying on standards set forth in the past, we hold that Appellants' reliance on *Ainoa* is misplaced. We therefore hold that the PUC did not err in referring to and evaluating the factors articulated in *In re Hawaii Electric Company*, Decision and Order No. 10620.

### 4. *The PUC did not err in adopting and applying a "prudent avoidance" standard in this contested case proceeding, rather than waiting for a rule-making proceeding to adopt such a standard.*

▇▇ Next, Appellants allege that the PUC erred in adopting and applying a "prudent avoidance" standard in this contested case proceeding, rather than waiting for a rule-making proceeding to adopt such a standard.

▇▇ As discussed in *Union Flights*, 957 F.2d at 688, "[a]dministrative agencies are generally free to announce new principles during adjudication."

The PUC, in the instant case, stated:

---

**18.** There is no statutory or other authoritatively persuasive consideration of the facts listed in Issue 2, *see supra* at 5, that requires the PUC to initiate a rulemaking proceeding. Appellants ignore the PUC's obligation to address applications

to commit funds under Rule 2.3(g)(2) by way of the contested case process, and the requirement to hold a public hearing in accordance with HRS § 269–27.5.

As acknowledged by the parties in this docket, there is no universally accepted definition of the term "prudent avoidance," as it is applied to EMF.... For purposes of this docket and pending adoption of a definition by some other authoritative source, we adopt the following explanation of prudent avoidance, put forth by the United States Environmental Protection Agency:

Prudent avoidance applied to EMFs suggests adopting measures to avoid EMF exposures when it is reasonable, practical, relatively inexpensive and simple to do. This position or course of action can be taken even if the risks are uncertain and even if safety issues are unresolved.

The PUC recognized that the health effects of EMF are uncertain and therefore adopted the concept of "prudent avoidance" to guide it in its decision making process in evaluating transmission line routes. As the PUC learns more about the health effects of EMF in the future, the scope of "prudent avoidance" could change. Indeed, three out of four witnesses for Appellants recognized that the health effects of EMF have not been conclusively proven.

The PUC did not have "sufficient experience" with the problem of EMF "to warrant rigidifying its tentative judgment into a hard and fast rule." *Chenery*, 332 U.S. at 202, 67 S.Ct. at 1580. As the PUC found, "a causal link between EMF and adverse health effects has yet to be established by those in the scientific community who have been researching this matter." Thus, the PUC, we believe, did not abuse its discretion in choosing to proceed with a case-by-case adjudication in this area.

Furthermore, once the PUC adopted the definition of "prudent avoidance," it was not arbitrary or capricious for the PUC to apply "prudent avoidance" to this case as "[a]djudicated cases may and do serve as vehicles for the formation of agency policies, which are applied and announced therein.... They generally provide a guide to action that the agency may be expected to take in future actions ... [and] may serve as precedents." *Wyman–Gordon Co.*, 394 U.S. at 765–66, 89

S.Ct. at 1429 (citations omitted and brackets added).

Therefore, in light of our holdings that: (1) giving precedential effect to prior commission decisions does not constitute rule-making; (2) the PUC's reliance on adjudication was not an abuse of discretion because: (a) the PUC did not circumvent the requirements of HAPA, and (b) Appellants did not suffer undue hardship because it relied on past policy; (3) Appellants' reliance on *Ainoa, supra,* is misplaced; and (4) the PUC did not err in adopting and applying a "prudent avoidance" standard in this contested case proceeding, we hold that the PUC did not violate HAPA by not promulgating rules to establish when transmission lines will be placed underground.

### B.

█ Appellants also contend that the PUC did not apply the alleged "rule" uniformly. In attempting to justify this claim, Appellants claim that the PUC acted arbitrarily because it "had no rule or procedure which would permit it to determine when ratepayers as a whole would consent to bear the costs [of the underground placement of transmission lines]." Appellants base their argument on the PUC's statement in its decision and order, No. 10620, that unless:

(1) there is a compelling reason (which outweighs the costs) to place the lines underground *or* (2) there is a stated public policy requiring the lines to be laid underground *or* (3) *the ratepayers as a whole consent to bear the high cost* of putting the lines underground, we do not believe that we should require HECO to place the transmission lines underground.

(Emphases added). For this, Appellants argue that the PUC was required to establish special procedures by which the ratepayers could manifest their consent in order to persuade the PUC that the cost of underground routing of transmission lines is acceptable.

The PUC has established procedures to obtain public comment and to allow public participation in contested cases pursuant to HRS § 269–27.5.

HRS § 269–27.5 (1993) provides:

**Construction of high-voltage electric transmission lines.** Whenever a public utility plans to place, construct, erect, or otherwise build a new 46 kilovolt or greater high-voltage electric transmission system above the surface of the ground through any residential area, the PUC shall conduct a public hearing prior to its issuance of approval thereof. Notice of the hearing shall be given in the manner provided in section 269–16 for notice of public hearings.

First, the PUC must hold, and did hold, a public hearing in the instant case, in accordance with HRS § 269–27.5. The purpose of this hearing was to allow the public to comment directly to the PUC on proposals to construct overhead, high-voltage electric transmission lines through any residential area. Thus, the PUC complied with the mechanism required by statute for obtaining public input.

Second, the PUC's rules provide a mechanism for parties to participate in contested case proceedings. *See* PUC Rules §§ 6–61–55 and 6–61–56. The PUC did not preclude anyone from becoming a party to the contested case proceeding. Appellants' participation demonstrates the PUC's willingness to allow individuals to participate and express their views fully, even though Appel-

lants moved to intervene almost a full year after the proceeding commenced.

Third, the public had extensive opportunities to provide input into the route selection process prior to the filing of HECO's application. The routing report and final EIS documenting this public input process were submitted to the PUC.

For these reasons, we hold that the general public had substantial opportunity to provide input to the PUC, and, therefore, the PUC established necessary procedures by which the ratepayers could manifest their consent in order to persuade the PUC that the cost of underground routing of transmission lines is acceptable.

### IV. CONCLUSION

For the reasons discussed above, we affirm the PUC's decision and order granting HECO's application to commit funds in excess of $500,000 to build, *inter alia*, high-voltage transmission lines.