**Electronically Filed
Intermediate Court of Appeals
CAAP-17-0000676
25-APR-2022
07:52 AM
Dkt. 64 SO**

NO. CAAP-17-0000676

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I


LIFE CARE CENTER OF HILO, Appellant-Appellant,
v.
DEPARTMENT OF HUMAN SERVICES, Appellee-Appellee


APPEAL FROM THE CIRCUIT COURT OF THE THIRD CIRCUIT
(CIVIL NO. 16-1-0413)


SUMMARY DISPOSITION ORDER
(By:  Ginoza, Chief Judge, Leonard and McCullen, JJ.)

In this secondary appeal, Appellant-Appellant Life Care Center of Hilo (**Life Care**) appeals from the July 19, 2017 "Court Order Affirming State of Hawai'i, Department of Human Services Decision and Order" (**Order Affirming D&O**) and the August 25, 2017 "Judgment" both entered by the Circuit Court of the Third Circuit (**Circuit Court**) in favor of Appellee-Appellee State of Hawai'i, Department of Human Services (**DHS**) and against Life Care.[1]

In the proceedings below, a DHS investigation determined that Life Care committed "caregiver neglect" of an 82-year old male resident (**Client A**) arising from a left buttock wound that was observed by Client A's niece and reported to the Life Care Director of Nursing, Valerie Nishi (**Director Nishi**), on December 1, 2015.  After an administrative hearing, a hearing officer at DHS issued a Notice of Administrative Hearing Decision (**D&O**) on November 1, 2016, which concluded that DHS correctly

_____

[1]  The Honorable Henry T. Nakamoto presided.

confirmed caregiver neglect by Life Care as defined in Hawaii Revised Statutes (**HRS**) § 346-222 (2015).[2]

On appeal, Life Care contends the Circuit Court erred in entering the Order Affirming D&O and Judgment because: (1) the Adult Protective and Community Services Branch of DHS (**APS**) failed to obtain a medical evaluation or consult with a physician as part of its investigation; (2) the Hearing Officer adopted APS's unsupported medical opinions or reached its own medical opinions that refuted unrebutted expert testimony; and (3) the Hearing Officer's finding caregiver neglect by Life Care is clearly erroneous and an abuse of discretion.

Upon careful review of the record and the briefs submitted, and having given due consideration to the arguments advanced and the issues raised, we resolve Life Care's points of error and affirm.

**(1)** Life Care contends that APS failed to obtain a medical evaluation or consult with a physician as part of its investigation pursuant to Hawaii Administrative Rules (**HAR**) §§ 17-1421-2 (2009) and 17-1421-9 (2009),[3] and thus exceeded

---

[2]  HRS § 346-222 provides, in pertinent part:

> "Caregiver neglect" means the failure of a caregiver to exercise that degree of care for a vulnerable adult that a reasonable person with the responsibility of a caregiver would exercise within the scope of the caregiver's assumed, legal or contractual duties, including but not limited to the failure to:
>
> . . .
>
> (4) Provide, in a timely manner, necessary health care, access to health care, prescribed medication, psychological care, physical care, or supervision[.]

[3]  HAR § 17-1421-2 provides in relevant part: "'Investigation' means the professional and systematic gathering and evaluation of information about the vulnerable adult for the purpose of making decisions regarding confirmation of abuse, protection of the vulnerable adult, and the provision of services for the vulnerable adult."

HAR § 17-1421-9 provides, in relevant part:

> (a) An investigation shall include but not be limited to . . .
> (2) Collateral contacts as needed with others such as . . . professionals who may have information about the vulnerable

(continued...)

statutory authority in finding caregiver neglect.[4]

Here, APS investigated who at Life Care "physically saw [Client A's] buttock wound, who was treating it, and why there was no incident report, documentation, and notification of the physician until the niece brought it to the staff's attention." Accordingly, DHS APS Specialist, Laron T. Kageyama (**APSS Kageyama**) interviewed those who had daily contact with Client A, or "professionals who may have information about the vulnerable adult relevant to the investigation," pursuant to HAR § 17-1421-9(a)(2), which consisted of eighteen Life Care registered nurses (**RN**), licensed practical nurses (**LPN**), and certified nurse assistants (**CNA**).

Life Care appears to argue that under the plain language of HAR § 17-1421-9(b), "shall" requires that APS arrange for medical evaluations in their investigations.  See HAR § 17-1421-9(b) ("The department shall arrange for appropriate evaluations to be conducted as necessary to complete the assessment, including but not limited to psychological, medical, or other evaluations in accordance with departmental procedures.")  However, Life Care's reading of the rule would remove the clear discretion afforded to DHS under HAR § 17-1421-9 to conduct appropriate evaluations "as necessary".  See Coon v. City & Cty. of Honolulu, 98 Hawaiʻi 233, 250, 47 P.3d 348, 365 (2002) (rules of statutory construction require rejection of an interpretation that renders any part of the statutory language a

---

[3](...continued)
        adult relevant to the investigation[.]

        . . . .

        (b) The department shall arrange for appropriate evaluations
        to be conducted as necessary to complete the assessment,
        including but not limited to psychological, medical, or
        other evaluations in accordance with departmental
        procedures.

    [4]  "Upon receiving a report that abuse of a vulnerable adult has occurred or is in danger of occurring if immediate action is not taken, the department shall cause an investigation to be commenced in accordance with this part as the department deems appropriate." HRS § 346-227 (2015).

nullity).  Thus, we decline to read HAR § 17-1421-9(b) to require DHS to arrange for evaluations in this case.[5]

Moreover, the Hearing Officer found caregiver neglect because Life Care failed to provide <u>supervision</u> of Client A's care.  <u>See</u> HRS § 346-222.  Through his investigation, APSS Kageyama determined, *inter alia*, that Life Care failed to provide healthcare in a timely manner because numerous nurses failed to assess, document, complete an incident report, or contact the physician, that Life Care failed to protect Client A from health and safety hazards by not completing skin assessments thoroughly and in a timely manner, and the RN assigned to the task of completing "non-pressure skin condition record" documentation said that she was not aware the assessment was supposed to be done weekly.  Life Care's impairment procedures require that when a CNA notices a new skin impairment, the CNA is to report to the charge nurse, who assesses the wound.  The charge nurse then reports to the unit manager or the nurse supervisor.  For a new skin impairment, an incident report is completed, which includes steps on notifying the resident's family and the physician.  Life Care also maintains a communication book that documents information from different shifts.  Life Care nursing protocol for wound care is to measure the wound, document the exact location of the wound, assess it, complete an incident report, contact the physician, contact the family, and monitor the wound.

The Hearing Officer concluded that documentation and supervision of Client A's care was critical given Client A is a

---

[5]  In its reply brief, Life Care relies on <u>Dep't of Human Servs. v. Nuuanu Hale</u>, No. 27975, 2008 WL 4949917 (Haw. App. Nov. 19, 2008) (Mem. Op.) as persuasive because the hearing officer relied on evidence obtained from the client's doctors and this court affirmed the hearing officer's finding that the lack of detailed documentation of specific steps taken did not warrant a finding of improper care.  Life Care's reliance on <u>Nuuanu Hale</u> is misplaced.  In <u>Nuuanu Hale</u>, we held the circuit court erred in reversing the hearing officer's decision because, *inter alia*, there was substantial evidence to support the hearing officer's decision, an agency's decision carries a presumption of validity, and we would not pass on issues dependent on witness credibility and the weight of conflicting evidence, which are the province of the hearing officer.  <u>Id.</u> at *13.  Here, there was substantial evidence to support the Hearing Officer's determination, and the Hearing Officer had to assess conflicting testimony and made credibility determinations to which we give deference.

vulnerable adult who is unable to communicate very well and "documentation of [Client A's] wounds and the progress of [Client A's] wounds is critical to insure that all the employees of [Life Care] would be aware of CLIENT A's condition and that a doctor could be informed and properly treat and monitor the situation." Furthermore, the Hearing Officer noted that: "Because the wound to CLIENT A's left buttock was never assessed or documented, [Life Care] could not properly care for CLIENT A. . . . The fact that when a nurse did see the wound she would put Sensi-care cream on it does not equal the proper degree of care of CLIENT A." The Hearing Officer also found the lack of assessing and documenting the wound was not harmless error, stating:

> [a]lthough Sensi-care cream is the primary treatment for CLIENT A's wounds, after [Life Care physician, R. Gary Johnson, M.D. (**Dr. Johnson**)] was made aware of CLIENT A's condition, he also prescribed morphine, an air mattress, masalt packing, and recommended a consultation with a wound specialist. Because there is a lack of documentation by [Life Care] as to the progress of the wound, it is impossible to determine whether these treatments could have, or would have, been administered earlier.

We conclude the Circuit Court did not err in the Order Affirming D&O that the testimony of the nurses at the hearing was sufficient in this case because "the use of a physician to evaluate and determine the supervision was not required in this situation where the documentation was so lacking, a reasonable person with responsibility of a caregiver can make this determination." APS's decision not to obtain a medical evaluation or consult with a physician was not in excess of its statutory authority or jurisdiction.

**(2)** Life Care contends that the Hearing Officer either adopted APS's unsupported medical opinions or made its own medical opinions without expert testimony despite unrebutted medical expert testimony by Dr. Johnson and Patricia L. Blanchette, M.D. (**Dr. Blanchette**).

Life Care argues that the expert testimony of physicians was required here because such testimony is required in medical malpractice claims to establish the degree of care required of medical professionals. However, this is not a

5

medical malpractice case, thus, a physician consult or medical evaluation was unnecessary.  See Kahoʻohanohano v. Dep't of Human Servs., State of Haw., 117 Hawaiʻi 262, 296, 178 P.3d 538, 572 (2008) (noting in medical malpractice actions expert opinion is generally required to determine the "degree of skill, knowledge, and experience required of the physician, and the breach of the medical standard of care." (emphases added) (quoting Exotics Hawaii-Kona, Inc. v. E.I. Du Pont de Nemours & Co., 116 Hawaiʻi 277, 300, 172 P.3d 1021, 1044 (2007)).

Under the circumstances in this case, establishing the appropriate standard of nursing care was within Director Nishi's expertise.  Director Nishi testified that as director of nursing at Life Care, her overall responsibilities were "[t]o ensure that the nurses are doing their jobs, following [Life Care] policies and procedures, and caring for [Life Care's] residents."  Director Nishi testified that documentation is important and a part of the care that is provided to the patient.  Director Nishi also testified she had to take numerous corrective actions by counseling several of the nurses and aides involved in this case about the process of assessing, documenting, and reporting changes in skin condition, told the nurses that documentation is very important, and told one RN to never assume that the next person knows about a client's wound.

Here, there was no documentation of the inception of Client A's left buttock wound or when it was first noticed on November 26, 2015.  According to the testimony at the administrative hearing on August 18, 2016, by DHS RN Lori Tsuruda (**RN Tsuruda**) and Director Nishi, Life Care nurses and assistants did not assess, measure, or document the progression of Client A's left buttock wound; it was a wound that occurred where, just over one month prior, there was intact skin; and upon its initial discovery the wound should have been assessed and documented because it is paramount to nursing care.

Finally, "courts decline to consider the weight of the evidence to ascertain whether it weighs in favor of the administrative findings, or to review the agency's findings of

fact by passing upon the credibility of witnesses or conflicts in testimony[.]"  In re Hawaiian Elec. Co., 81 Hawai'i 459, 465, 918 P.2d 561, 567 (1996).  Although Dr. Blanchette testified that the nurses were giving good care, the Hearing Officer found the testimony to be unpersuasive because "without the proper documentation, Dr. Blanchette is at a disadvantage as to knowing CLIENT A's condition" and "it is unclear what Dr. Johnson would have prescribed because we do not know what Dr. Johnson would have seen had he examined the left buttock wound."  Instead, the Hearing Officer found the testimony by Director Nishi and RN Tsuruda to be "persuasive as to the duties of [Life Care] as a caregiver which included the importance of assessing the wound, properly documenting it as to its location and size, and informing the doctor of the wound and that those duties are part of the degree of care of CLIENT A."  Therefore, the Hearing Officer was not obligated to adopt the testimony of the physicians, where the issue was caregiver neglect based on failure to provide timely and necessary supervision, i.e., failure of nursing staff to document Client A's wound.  Moreover, given that the Hearing Officer made credibility determinations that we must defer to, we conclude the Circuit Court did not erroneously affirm the APS's finding of caregiver neglect.

As for Life Care's contention that less than optimal charting alone does not constitute caregiver neglect where physicians testified the nurses were providing the correct treatment, i.e., the Sensi-Care, a finding of caregiver neglect is supported when there is substantial evidence that Life Care failed "to provide, in a timely manner, necessary health care, access to health care, prescribed medication, psychological care, physical care, or supervision."  HRS § 346-222 (emphasis added).

Director Nishi's testimony established that the expected care by Life Care nurses to assess, measure, and document all wounds was not done for Client A prior to December 1, 2015.  Further, despite Life Care's argument that before December 1, 2015, the left buttock wound was not in an aggravated condition or that APS ignored Dr. Johnson's testimony that the

seizure exacerbated the wound, APSS Kageyamas' reports show that the wound was getting worse prior to December 1, 2015.

Dr. Johnson testified that if prior to December 1, 2015, the wound looked like it did when he learned of it, then the care provided by Life Care nurses was not appropriate and he would have ordered morphine for wound management comfort, not just Sensi-Care.  Because Dr. Johnson did not see Client A's left buttock wound prior to December 1, 2015, and without proper assessment and documentation of the wound from the time it was first noticed approximately five days earlier, the Hearing Officer did not err in concluding "we cannot definitively find what care would have or should have been prescribed before December 1, 2015[.]"  Additionally, RN Tsuruda testified that there was absolutely no documentation of how the wound was responding to the Sensi-Care and that the nurses who applied Sensi-Care to the wound should have cleaned the entire area but it appeared from the nurses statements that new Sensi-Care had been applied over the old Sensi-Care without assessment of the wound.

Given the substantial record evidence of the Life Care nurses' failure to properly assess and document Client A's left buttock wound, Dr. Johnson's alternative explanation for its cause - that the seizures caused friction and led to the opening of the wound in an area that had previously been damaged and healed - does not address whether caregiver neglect occurred. Furthermore, the testimony by Dr. Johnson that Client A had previously damaged and healed skin impairment does not support Life Care's assertion that the left buttock wound was not in an exacerbated state prior to December 1, 2015.

(3) In light of the foregoing, the Hearing Officer did not clearly err in determining that Life Care committed caregiver neglect. Tauese v. State, Dep't of Labor & Indus. Rels., 113 Hawaiʻi 1, 25, 147 P.3d 785, 809 (2006), ("'An agency's findings are not clearly erroneous and will be upheld if supported by reliable, probative and substantial evidence unless the reviewing court is left with a firm and definite conviction that a mistake

has been made.'" (citation omitted)) <u>as corrected</u> (Nov. 21, 2006).  We will not pass upon issues dependent on the credibility of witnesses and the weight of conflicting evidence, <u>In re Hawaiian Elec. Co.</u>, 81 Hawaiʻi at 465, 918 P.2d at 567, which is the province of the Administrative Hearing Officer in his or her field of expertise.  Therefore, DHS's finding of caregiver neglect was not clearly erroneous or an abuse of discretion, nor did the Circuit Court err in affirming the D&O.

Therefore, IT IS HEREBY ORDERED that the "Court Order Affirming State of Hawaiʻi, Department of Human Services Decision and Order," entered on July 19, 2017, and the "Judgment" entered on August 25, 2017, by the Circuit Court of the Third Circuit, are affirmed.

DATED:  Honolulu, Hawaiʻi, April 25, 2022.


On the briefs:                    /s/ Lisa M. Ginoza
                                  Chief Judge
Kenneth S. Robbins,
Melinda Weaver,                   /s/ Katherine G. Leonard
for Appellant-Appellant           Associate Judge

Heidi M. Rian,                    /s/ Sonja M.P. McCullen
Candace J. Park,                  Associate Judge
Deputy Attorneys General,
Department of Attorney General,
for Appellee-Appellee