**Electronically Filed
Intermediate Court of Appeals
CAAP-15-0000565
31-JAN-2019
09:41 AM**

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI'I

---o0o---

LELAND H. DAO, Respondent-Appellant/Appellant, v.
ZONING BOARD OF APPEALS, CITY AND COUNTY OF HONOLULU,
STATE OF HAWAI'I, Agency-Appellee/Appellee, and
DIRECTOR OF THE DEPARTMENT OF PLANNING AND PERMITTING,
CITY AND COUNTY OF HONOLULU, STATE OF HAWAI'I,
Petitioner-Appellee/Appellee

NO. CAAP-15-0000565

APPEAL FROM THE CIRCUIT COURT OF THE FIRST CIRCUIT
(CIVIL NO. 13-1-2180-08)

JANUARY 31, 2019

GINOZA, CHIEF JUDGE, LEONARD AND REIFURTH, JJ.

OPINION OF THE COURT BY LEONARD, J.

This case concerns alleged unlawful transient vacation

unit[1] rentals by Respondent-Appellant Leland H. Dao, M.D. (**Dao**)

---

[1]     ROH § 21-10.1 provides, in relevant part:

"Transient vacation unit" means a dwelling unit or
lodging unit which is provided for compensation to transient
occupants for less than 30 days, other than a bed and
breakfast home. For purposes of this definition,

(continued...)

in violation of certain provisions of the Land Use Ordinance (**LUO**) of the City and County of Honolulu, codified as Revised Ordinances of Honolulu (**ROH**) Chapter 21 (1990).[2] Dao appeals from the Final Judgment (**Judgment**) entered on July 29, 2015, by the Circuit Court of the First Circuit (**Circuit Court**).[3] On secondary appeal, Dao contends that the Circuit Court erred in affirming the decision of the Zoning Board of Appeals of the City and County of Honolulu (**ZBA**), which upheld the actions of the Director (**Director**) of the Department of Planning and Permitting of the City and County of Honolulu (**DPP**). Dao requests that this court vacate the decision of the Circuit Court and enter judgment in favor of Dao, vacating two Notices of Order issued by the Director against him. In the alternative, Dao requests that judgment be entered in favor of Dao and against the Director, vacating the first Notice of Order and reducing the civil fines imposed by the second Notice of Order.

We hold, *inter alia*, that: (1) a transient vacation unit rental violation cannot be established based solely on a DPP inspector's report of a conversation with an unidentified person who is encountered at a subject property; (2) if an agency's factual determination that a violation occurred and is continuing is not grounded in reliable, probative, and substantial evidence,

---

[1] (...continued)
        compensation includes, but is not limited to, monetary payment, services or labor of employees.

[2]     ROH Chapter 21 is available at https://www.honolulu.gov/ocs/roh/193-site-ocs-cat/975-roh-chapter-21.html (last visited January 29, 2019).

[3]     The Honorable Rhonda A. Nishimura presided.

including any reasonable inferences that may be drawn from that evidence, then the agency's decision may be determined to be clearly erroneous and therefore unjust and unreasonable in its consequences, warranting reversal or modification; (3) in this case, the Director permissibly determined that notwithstanding the existence of written rental agreements for periods of thirty or more days, based on the parties' actual intent, understanding, agreement, and undertaking, Dao had in fact provided a dwelling unit or lodging unit to transient occupants for less than thirty days; (4) the LUO's prohibition of transient vacation unit rentals in residential districts is violated when, and only during the period that, the prohibited use occurs; and (5) although we note that the Director's discretion to determine an appropriate fine for a violation of the LUO must be exercised within the parameters stated in the DPP's administrative rules, because the fines levied against Dao are vacated on other grounds, we need not reach the issue of whether the amounts levied were improper. As explained below, we conclude that the ZBA and the Circuit Court erred in affirming Dao's first alleged transient vacation rental unit violation, and this case must be remanded for further proceedings to re-determine the period of Dao's second alleged violation, as well as the fines stemming from the second alleged transient vacation rental unit violation.

I.    BACKGROUND FACTS

A.    The Alleged Violations

Dao is the owner of a residential property on Kamehameha Highway in Haleiwa, Hawai'i (the **Property**). On

October 3, 2011, the DPP received a complaint from the public alleging that unlawful transient vacation rentals were taking place at the Property. DPP Inspector Todd Labang (**Labang**) responded to the complaint by conducting an inspection of the Property on October 12, 2011, where he spoke with a man who did not identify himself. The unidentified man reportedly told Labang that he was renting the Property from October 11, 2011, through October 13, 2011.

On behalf of the Director, Labang issued a DPP Notice of Violation No. 2011/NOV-10-082 (**NOV #1**) on October 13, 2011. The notice was addressed to Dao and specified that the dwelling on the Property was being used as a transient vacation unit without a nonconforming use certificate, in violation of ROH §§ 21-3.70-1 and 21-4.110-1 (1990).[4] The notice instructed Dao to "restore the area immediately and complete all work within 30 days" and to call Labang "after the corrections have been made" or civil fines would be imposed.

On October 20, 2011, Dao sent a letter to Labang confirming receipt of NOV #1 and stating that he only had long-

---

[4] ROH § 21-3.70-1 governs uses and development standards within residential districts; permitted uses are enumerated in LUO Master Use Table 21-3, which is referenced in ROH § 21-3.70-1. Transient vacation units are not permitted uses in residential districts. ROH § 21-4.110-1 provides, in relevant part:

> **Sec. 21-4.110-1    Nonconforming use certificates for transient vacation units.**
> . . . .
> (c)    Failure to obtain a nonconforming use certificate within nine months of December 28, 1989 shall mean that the alleged nonconforming use, as of December 28, 1989, is not a bona fide nonconforming use, and shall not continue as a nonconforming use but shall be treated as an illegal use.

term renters on the Property and many guests during the surfing season.

It appears that on November 30, 2011, Labang re-inspected the Property. No one was present at the Property on November 30, 2011. According to his Inspector's Report, the re-inspection "revealed no change."

On December 14, 2011, the Director issued Notice of Order No. 2011/NOO-289 (**NOO #1**), which ordered Dao to (1) pay an initial fine of $1,000 by January 17, 2012, and (2) correct the violation by December 29, 2011. NOO #1 stated that if the correction was not completed by that date, daily fines of $1,000 would be assessed until the correction was completed. The notice also specified that Dao "was responsible for contacting the inspector . . . to verify the corrective action."

On December 16, 2011, Dao re-submitted his letter dated October 20, 2011, attaching a "rental agreement statement by tenant and bank statement of funds deposited for her payment." The "rental agreement statement" was purportedly an e-mail from Monika Iseli (**Iseli**), stating that she rented the Property from October 3, 2011, through November 7, 2011. The "bank statement" indicated that Iseli paid $6,869.00 on September 2, 2011.

According to a further Inspector's Report, on December 30, 2011, Labang re-inspected the Property and determined that the violation was corrected because "[t]he people who were there previously moved out" and Dao had "provided a rental contract and proof of payment for the new occupant[] of the dwelling, Benedict Strasser." This written contract (**Strasser Lease**) was dated

December 22, 2011, and provided that Strasser paid $3,077.59 to rent the Property from December 22, 2011, through January 21, 2012.

It appears based on, *inter alia*, Labang's notes that on January 10, 2012, the DPP received another complaint from the public requesting investigation into alleged transient vacation rentals on the Property. On January 11, 2012, Labang inspected the Property again. According to the Inspector's Report, this inspection revealed that the dwelling was "being rented by the Lawson [Heath] family from Australia for 3 days" and that "Mr. Lawson [Heath] said they are not renting for 30 days." The report noted that these were different people than those who were identified in the Strasser Lease.

On January 12, 2012, for the Director, Labang issued Notice of Violation No. 2012/NOV-01-080 (**NOV #2**). NOV #2 differed from NOV #1 in designating the violation as a "recurring violation" requiring immediate correction "within 0 days."

On January 17, 2012, Dao sent a Petition for Appeal to the ZBA regarding NOV #1, NOO #1, and NOV #2. Dao's petition asserted, *inter alia*, that the "appeal is to verify that the Director's actions are based on an erroneous findings of material facts, and has acted in an arbitrary and capricious manner, and manifestly abused his discretion in imposing this fine." In the petition, Dao detailed his prior communications with Labang. Dao stated that upon contacting Labang regarding NOV #1, Labang asked for a rental agreement and proof of payment. After Dao submitted

the e-mail from Iseli,[5] Labang told him that the e-mail was not sufficient and requested a rental agreement for a new tenant. Dao noted that after he provided the Strasser Lease, which corrected the violation underlying NOV #1 and NOO #1, he received a letter from the DPP dated January 5, 2012, which stated that the initial fine was still due and owing. Regarding NOV #2, Dao stated that "[t]he current tenant is renting a separate room from the previously mentioned tenant, both have valid rental agreements, for rental for 30 days."

On January 23, 2012, the Director issued DPP Notice of Order No. 2012/NOO-011 (**NOO #2**), which ordered Dao to (1) pay an initial fine of $1,000 by February 23, 2012, and (2) correct the violation by January 30, 2012. Like NOO #1, NOO #2 informed Dao that daily fines of $1,000 would be assessed if the violation was not corrected by the date specified.

On January 30, 2012, Dao sent a letter to Labang confirming receipt of NOV #2 and stating that Dao only had long-term renters on the Property. Attached to this letter were purported bank statements showing deposits of $1,288.90 and $872.79 dated December 8, 2011, and August 31, 2011, respectively.

On February 2, 2012, Dao sent a thirty-day rental contract and proof of payment to Labang which provided that Lawson Heath (**Heath**) was renting the Property from January 9, 2012, through February 9, 2012 (**Heath Lease**). The Heath Lease

---

[5]     In the petition, Dao also noted that no rental agreement had ever been drawn for Iseli, so no rental agreement with her existed.

was dated January 9, 2012, and indicated that Heath had paid $1,655.54.  After noting in his report that the Heath Lease conflicted with the Strasser Lease, Labang determined that the violation underlying NOV #2 and NOO #2 was not corrected.

According to his notes, on February 8, 2012, Labang re-inspected the Property and found that the dwelling was "being rented by Tim Crane [**Crane**] and his girlfriend, Jessie Robinson," from February 6, 2012, through February 10, 2012, with no thirty-day rental contract.  Labang noted that the violation was not corrected.

On February 22, 2012, Dao sent a second Petition for Appeal to the ZBA regarding NOV #1, NOO #1, NOV #2, and NOO #2. This petition re-asserted the facts as they had been described in the first petition and asserted that ROH § 21-5.550[6] was implicated in this matter.  In addition, Dao stated that "multiple attempts have been made to try and show the Inspector the rental agreements of each tenant via fax and telephone messages."

---

[6]     ROH § 21-5.550 provides:

> **Sec. 21-5.550     Roomers, accessory.**
>     Accessory roomers shall be limited to a maximum of three, provided the dwelling is also occupied by a family composed of persons related by blood, marriage or adoption, and is not used as a group living facility.

ROH § 21-10.1 further provides:

>     "Rooming" means a use accessory to the principal use of a dwelling unit in which overnight accommodations are provided to persons ("roomers") for compensation for periods of 30 days or more in the same dwelling unit as that occupied by an owner, lessee, operator or proprietor of the dwelling unit.

On April 5, 2012, John M. Friedel, for the Director, sent a letter to Dao stating that the violation underlying NOV #2 and NOO #2 was corrected on April 2, 2012, when a re-inspection of the Property revealed that "the transient vacation use was discontinued and the dwelling was occupied by the owner." The letter also notified Dao that "[a]lthough the violation was resolved, the $1,000 initial fine and daily fines [of] $62,000 remain unpaid."[7] The letter noted that the DPP would accept $16,500 in settlement of the outstanding fines because the violation was corrected.

B.     The Contested Case Hearing

On January 27, 2012, the ZBA notified Dao that the ZBA would hold a contested case hearing to consider his petition of appeal filed on January 17, 2012. On February 24, 2012, the ZBA notified Dao that the ZBA would hold a contested case hearing to consider his petition filed on February 22, 2012. The latter notice specified that the issue to be addressed in the appeal was:

> Whether the action of the Director in issuing Notice of
> Order Nos. 2011/NOO-289 and 2012/NOO-011 for violations of
> ROH Sections 21-3.70-1 and 21-4.110-1 was based on an
> erroneous finding of a material fact, or whether the
> Director acted in an arbitrary or capricious manner, or
> manifestly abused his discretion[.]

On March 8, 2012, the ZBA consolidated Dao's two appeals. On April 23, 2012, the contested case hearing was rescheduled to July 12, 2012.

---

[7]     It appears that this daily fine was assessed for January 31, 2012, 29 days in February of 2012, 31 days in March of 2012, and April 1, 2012, a total of 62 days.

On June 25, 2012, Dao filed his Position Statement. In his Position Statement, Dao re-asserted the facts as they were described in his petitions for appeal. In addition, Dao asserted that he rented rooms on his Property for thirty days or more pursuant to ROH § 21-5.550. Attached to his Position Statement were the Strasser Lease, the Heath Lease, a Rental Agreement from Crane (**Crane Lease**), and e-mails from the Strassers and Crane stating that they had rented specific rooms. The Crane Lease provided that Crane had paid $2,018.90 to rent the Property for thirty-one days beginning on February 6, 2012.

On July 3, 2012, the Director filed a Position Statement. The Director argued, *inter alia*, that the issuance of NOO #1 and NOO #2 was not based on an erroneous finding of fact and that the actions of the Director were rational based on the site inspections and did not constitute an abuse of discretion.

After a further rescheduling, on August 9, 2012, the contested case hearing took place. Dao, appearing *pro se*, called himself and Iseli as witnesses. DPP Inspector Colin Ishikawa (**Ishikawa**), neighbors Joyce Farrell (**Farrell**) and Beau Sheil (**Sheil**), and Labang testified on behalf of the Director.

Regarding NOV #1 and NOO #1, Dao testified that the unidentified man who had spoken with Labang on October 12, 2011, was a friend who was not renting. Dao further testified that he had created a rental agreement with Iseli after-the-fact to reflect her stay in 2011. Regarding NOV #2, Dao testified:

> Mr. Labang did not investigate sufficiently and did not know that we rent several rooms in the home and the tenant that he was inquiring about rents a room separately from the initial tenant and they both had valid rental agreements.

> We had multiple attempts to try to show these to Mr. Labang;
> however, we were not able to give that to him.

In summarizing his position, Dao stated "it is likely that the [DPP] has not been provided with all the facts and, therefore . . . the director acted in an arbitrary and capricious manner and manifestly abused his discretion in not closing this file." Following Dao's testimony, the Director objected to Exhibits I, J, K, and L[8] of Dao's Position Statement on the grounds that they were not provided to the Director "during the course of the events." The Director's objections were noted, but not sustained.

On cross-examination, Dao confirmed that he did not have a nonconforming use certificate allowing rentals of his Property for less than thirty days. Upon further questioning, Dao testified that his tenants "would rent for the month," that they "were there during the 30 days at some point," but "if they left early then they would have left early." Dao further testified that he "did not have leases at the time" and "started creating leases after Mr. Labang asked [him] to." Counsel for the Director then questioned Dao regarding the various amounts paid for the leases, as follows:

> [Mr. Jayaram:[9]] So the amounts that they paid for
> their lease, does that reflect the value based on your
> property for a 30-day rental or for the amount of time that
> they expected to stay?
> [Dao:] It could be either.

---

[8] Exhibits I, J, K, and L constituted the Crane Lease, the e-mails from Strasser and Crane specifying rented rooms, and Dao's letter to Labang of January 30, 2012, with purported bank statements attached.

[9] Krishna Jayaram, Deputy Corporation Counsel, for the Director.

> [Mr. Jayaram:]  Do you have a set room rate for each room?
> [Dao:]  In general we do, but we do vary that sometimes.
> [Mr. Jayaram:]  Okay. What accounts for the variance? Ms. Iseli, for example, paid about $196 per day whereas Mr. Heath paid about $51 per day.  It's almost a quarter less.
> [Dao:]  Just depends if we know the person, you know. If they're a friend of a person we may give them a discount.
> [Mr. Jayaram:]  I see.
> [Dao:]  If they think they may be leaving early.
> [Mr. Jayaram:]  . . . So just to be clear, your testimony is that you had a prior understanding that these folks -- Strasser, Heath and Crane -- were staying for less than 30 days but you entered into a lease term of 30 days?
> [Dao:]  Yes.

Upon follow-up questions from the ZBA, Dao further testified:

> THE CHAIR:[10]  And you said that you gained a lot of your tenants from a website.
> [Dao:]  Right.
> THE CHAIR:  What website is that?
> [Dao:]  We use homeaway.com and VRBO.com.
> THE CHAIR:  . . . V-R-B-O?
> [Dao:]  Yes.
> THE CHAIR:  Is that an abbreviation for something?
> [Dao:]  Vacation rental by owner.

Dao also testified that he spent an average of four nights a week at the Property, and a caretaker and family member lived at the Property while Dao was away.

Ishikawa testified that inspections are triggered primarily by complaints from the public.  Upon cross-examination, Ishikawa further testified that with the type of violations at issue, the DPP will "accept a 30-day contract with proof of payment," but "during that 30-day period, nobody else can be in that house."  Ishikawa also confirmed that rental situations involving no written rental agreement are "very common," elaborating:

> We make an inspection of the people.  I ask them if they're renting.  We ask them if they have a 30-day contract.  If

---

[10]    Ronald T. Ogomori, Chair, ZBA.

> they have a 30-day contract, we don't do anything. If they
> don't have a 30-day contract, they say they're renting for
> less than 30 days, we'll issue a notice of violation.

Upon further questioning, Ishikawa confirmed that the basis of NOO #1 was the statement given to Labang by the unidentified man who said he rented the Property from October 11 through October 13, 2011. Ishikawa also confirmed that the primary basis of NOO #2 was the rental of the Property by the Strassers and the Lawsons. Upon recross-examination, Ishikawa confirmed that the DPP will issue a notice of violation even where the renter does not provide identification. On redirect, Ishikawa testified as follows:

> [Mr. Jayaram:] What if somebody provided you with a
> lease for more than 30 days and also a sworn statement that
> they never intended to rent for that period of time?
> [Ishikawa:] . . . I think that'll be a violation if
> they provide us a written statement saying that they're not
> going to rent for 30 days. I think that'll be a violation.

Labang also testified regarding the standard process for transient vacation rental inspections, which are unannounced. Labang testified that the "objective is to meet with somebody at the Property and to determine whether or not they are renting the Property and for how long." Further, "[o]ne of the first questions [he asks] is if the person is the owner of the Property. If they are not, [he asks] if the owner is present or staying at the Property." When asked whether inspectors have "any ability to ask for identification," Labang testified that he "can ask," but that he "can't get it out of them" if they do not wish to be identified. Regarding the unidentified man who was at

the Property on October 12, 2011, Labang testified that this person said he was renting the Property and that he did not know the owner.

Labang also testified that Dao's letter of October 20, 2011, which stated that there was no vacation rental, was not acceptable as a valid means of correcting the violation. Labang testified that he had explained to Dao that the DPP "would either need a 30-day contract with the occupant's - the renter's names on it as well as proof of payment for that time period or [Labang] would need to perform a site inspection to verify that the dwelling was vacant." Labang also testified that Dao's re-submission of the same letter with an e-mail and bank statement from Iseli attached was also not sufficient because "that was not a valid rental contract and . . . it would need to be a valid rental contract for it to be corrected."

Labang confirmed that the violation underlying NOO #1 was corrected based on the Strasser Lease, but testified that had he known the Strasser Lease was made with the understanding that Strasser would be staying less than 30 days, then he would not have accepted the lease.

Regarding NOV #2, Labang testified that a "recurring violation" means "it was the second time [the DPP] issued for the same violation," therefore Dao "was given zero days to correct it and it was automatically referred for civil fines."[11] Further,

---

[11] Department of Planning and Permitting City and County of Honolulu Administrative Rules, Part 1 - Rules of Practice and Procedure (DPPRPP) § 1-1, provides, in relevant part: "'Recurring violation' means a repetition of the same type of violation of the Land Use Ordinance or of the same permit
(continued...)

14

Labang testified that he did not accept the Heath Lease as a correction of the violation because there was overlap with the Strasser Lease, which is a violation.

The ZBA asked Labang a number of follow-up questions regarding why the overlap in the leases constituted a violation. Upon questioning, Labang confirmed that he enforces DPP policy such "that when the lease does not specify a particular part of the property, that that is construed to mean the entire property." Labang also confirmed that the DPP viewed Dao's Property as a single dwelling[12] "based upon what [the Property] was initially constructed as or permitted as." This view, coupled with the fact that the leases did not specify rented rooms, led to the conclusion that "when the Strassers rented the property, they rented the whole house." Labang confirmed that this meant that "even if [the Strassers] left early, the house should have been vacant until January 21st, 2012," but instead Labang re-inspected the Property on January 11, 2012, and found the Heath family at the Property and received a statement from Heath that they were renting for about three days.

---

[11] (...continued)
condition, at the same location, by the same responsible party." See City and County of Honolulu Department of Planning and Permitting, http://www.honolulu dpp.org/AboutDPP/WhatWeDo/AdministrativeRules.aspx (last visited January 29, 2019).

[12]     ROH § 21-10.1 provides, in relevant part:

> "Dwelling unit" means a room or rooms connected together, constituting an independent housekeeping unit for a family and containing a single kitchen. . . . Unless specifically permitted in use regulations, a dwelling unit shall not include a unit used for time sharing or a transient vacation unit as defined in this chapter.

Farrell, who lived "directly next door," testified that Dao did not live at the Property and that the number of cars driving down their dead-end street had "increased decidedly," with twenty-three different cars staying at the Property overnight over an eight-week period.[13]  Farrell estimated an average of three or four different cars per week would stay overnight.   Upon further questioning, Farrell testified:

> [Mr. Jayaram:] How do you know they weren't there for the day, to spend the day at the beach as guests of Dr. Dao?
> [Ms. Farrell:]  I'll see a car -- it's a rent-a-car -- come in and I see people open their trunk and I see them take luggage out and they walk into one of the places. And then three or four days later they come out and they put their luggage in their trunks and they drive out and then I don't see that car again. So -- and then another car comes.
> This is a commercial venture that's going on right next door.

When asked whether she had ever spoken to any of these people or had any way of knowing whether they were actually renters, Farrell testified that she did not "make it a point to talk to the renters" but recalled two occasions where she had spoken to different groups of people staying at the Property who said they were renting "for three or four days" and staying "for a week or two" for a surf tournament.

Sheil, another neighbor, testified that he and his wife began keeping track of the number of cars staying overnight at the Property after a conversation with Ishikawa on January 10, 2012.  The Sheils sent their car logs to the DPP on a weekly basis beginning with the week of January 10, 2012.  During the period from January 10 through January 21, 2012, the period

---

[13]    Although Farrell did not specifically testify as to the dates included in this eight-week period, based on her testimony as a whole, it appears that this eight-week period fell between the end of December of 2011 and the first part of March 2012.

covered by the Strasser Lease, Sheil counted four different cars staying overnight at the Property that were all new to the neighborhood, with each car staying less than three days. Between January 9 and February 7, 2012, which was the period covered by the Heath Lease, Sheil testified that thirteen different cars were observed to stay at the Property overnight, with none of them staying longer than seven days. For the period of the Crane Lease, which commenced on February 6, 2012, Sheil testified that he and his neighbors logged fourteen different cars staying overnight over the thirty-one days, with none staying longer than seven days. In addition, for that period there was never an absence of cars. When asked what kind of cars were observed, Sheil clarified that they were all rental cars and "recently-registered."

Sheil confirmed that Dao visited the Property about four days a week, but Sheil also testified that Dao did not stay overnight very often, estimating "maybe half a dozen times in the last six months."

At the conclusion of the contested case hearing, the ZBA orally denied both of Dao's appeals. A ZBA Board member moved for the denial of the first appeal as follows:

> When the notice of violation was issued, it created a situation where the owners -- the owner now has the burden to produce evidence that the inspection produced the wrong result. And we have not been presented with and we have not seen any evidence to rebut the inspection result which was that that was being used by a short-term renter.

The same ZBA Board member moved for the denial of the second appeal as follows:

> Under the same situation, upon issuance of the notice of violation, it became incumbent upon the owner to rebut

the violation.   That violation related specifically to the inspection which was conducted on January 11, 2012 where the inspector talked to Mr. Lawson Heath. . . .
And we have two situations, the testimony and the evidence with respect to the note . . . that the inspector spoke to Mr. Heath.  Mr. Heath told him he was staying only for three days and was leaving on January 12 and was not renting for 30 days and had no contract.  So we have that testimony.
We also have testimony from the petitioner that Mr. Lawson Heath signed the lease . . . on January 9th and he met with Mr. Lawson Heath on that day to sign this contract. To me those are totally irreconcilable differences.  How could Mr. Heath sign this on January 9th, yet two days later when he talked to the inspector admit that he signed no lease, that he was staying not for 30 days but for three days.
In such a situation, my view on that point is that we got to believe somebody and not believe somebody else.  In that case, I'm believing as credible Mr. Labang and not believing as not credible Dr. Dao on that point.

Both motions were seconded and approved by the ZBA.

On July 12, 2013, the ZBA filed its Findings of Fact, Conclusions of Law, and Decision and Order (**ZBA Order**).  With respect to NOO #1, the ZBA issued Findings of Fact (**FOFs**) Nos. 5 through 8, and Conclusions of Law (**COLs**) Nos. 1 through 3, in relevant part as follows:

5.      A DPP Inspector visited the Property on October 12, 2011 and interviewed a man who refused to identify himself but informed the DPP Inspector that: (a) he was renting the Property for two days, (b) he did not have a 30 day lease, and (c) the Property owner was not present.

6.      Based on the inspection results DPP thereafter issued [NOV #1] to Appellant.

7.      [NOV #1] instructed Appellant to correct the violation within 30 days from the date of notice -- otherwise a Notice of Order would be issued and civil fines would be imposed.

8.      Appellant did not correct the violation within 30 days from the date of notice.

. . . .

1.      That the Director's issuance of [NOO #1] was not based on an erroneous finding of a material fact.

2.      That the Director's issuance of [NOO #1] was not arbitrary or capricious.

3.  That the Director's issuance of [NOO #1] was not a manifest abuse of his discretion.

With respect to NOO #2, the ZBA issued FOFs Nos. 14 through 21, and COLs Nos. 4 through 6, as follows:

14. A DPP Inspector again visited the Property on January 11, 2012 and interviewed Lawson Heath who informed the DPP Inspector that: (a) he was renting the Property for three days, (b) he did not have a 30 day lease, and (c) the Property owner was not present.

15. Based on the inspection results DPP thereafter issued [NOV #2] to Appellant.

16. Because it was considered a recurring violation, this Notice of Violation instructed Appellant to correct the violation immediately - otherwise a Notice of Order would be issued and civil fines would be imposed.

17. Appellant did not correct the violation immediately.

18. DPP issued [NOO #2] to Appellant.

19. [NOO #2] instructed Appellant to pay a fine of $1000 by February 23, 2012, and to correct the violation by January 30, 2012 - otherwise a daily fine of $1000 would thereafter be assessed until the violation was corrected.

20. A DPP Inspector again revisited the Property on February 8, 2012 and interviewed Tim Crane who informed the DPP Inspector that: (a) he was renting the Property for four days, (b) he did not have a 30 day lease, and (c) the Property owner was not present.

21. DPP deemed the violation corrected as of April 2, 2012, based on an inspection which showed the Property was occupied by the Appellant.

. . . .

4.  That the Director's issuance of [NOO #2] was not based on an erroneous finding of a material fact.

5.  That the Director's issuance of [NOO #2] was not arbitrary or capricious.

6.  That the Director's issuance of [NOO #2] was not a manifest abuse of his discretion.

C.  Appeal to Circuit Court

On August 9, 2013, Dao filed a Notice of Appeal from the ZBA Order. The Circuit Court initially dismissed the case for failure to comply with Hawai'i Rules of Civil Procedure

(HRCP) Rule 72(d)(1),[14] then granted Dao's motion to set aside the order of dismissal for good cause shown. The Circuit Court scheduled the matter for briefing and oral argument on July 3, 2014.

On July 3, 2014, following oral argument, the Circuit Court upheld the ZBA Order. The Circuit Court's minutes noted, with respect to the second violation, that once there was a notice of violation, "it is incumbent on the homeowner not [the] DPP to deal with the negative."

On July 23, 2014, the Circuit Court entered its Decision and Order Denying and Dismissing Appellant's Appeal filed on August 9, 2013. The Circuit Court found:

> 1. The Court finds that it sits as an Appellate Court to the extent that the Court is confined by the record on appeal, to wit, what was brought before the ZBA, as well as the Court's judicial review, which is similarly governed by Hawaii Revised Statutes ("HRS") §91-14.
>
> 2. The Court finds that with respect to the First NOO there was sufficient evidence documented in the record

---

[14] HRCP Rule 72(d)(1) provides:

> **(d) Record on Appeal.**
> (1) DESIGNATION. The appellant shall, within the time provided for filing the notice of appeal or within such further time, not to exceed 30 days, as may be allowed by the court for good cause shown, prepare and present to the clerk of the circuit court a designation, which shall specify the papers, transcripts, minutes and exhibits which the appellant desires filed in the circuit court in connection with the appeal. The clerk, in the name and under the seal of the circuit court, shall endorse on the designation an order, directed to the official or body whose decision, order or action is appealed from, commanding the latter to certify and transmit such papers, transcripts, minutes and exhibits to the circuit court within 20 days of the date of the order or within such further time as may be allowed by the court. The clerk shall issue certified copies of such designation and order to the appellant for service upon the official or body whose decision, order or action is appealed from and for service upon any other appellee. The appellant shall serve certified copies of the designation and order and shall make due return of service thereof to the clerk of the circuit court. The circuit court may compel obedience to the order by any appropriate process.

on appeal such that the ZBA's decision to uphold the Director's action in issuing the First NOO was not clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record.

3. The Court finds that with respect to the Second NOO, the ZBA Decision and Order was not in violation of constitutional or statutory authority, clearly erroneous, or arbitrary, or capricious, or characterized by abuse of discretion when the Appellant (a) received a notice of violation on January 12, 2012 that informed him the Department found a second violation on his Property, (b) had an obligation to demonstrate to the Department that there was no violation on his Property in order to correct the violation, avoid the issuance of the Second NOO, and preclude monetary fines, and (c) failed to make such demonstration until April 2, 2012.

4. The Court further finds that the Appellant has failed to demonstrate that substantial rights of the Appellant have been prejudiced by the ZBA Decision and Order.

Accordingly, the Circuit Court affirmed the ZBA Order. On July 29, 2015, the Circuit Court entered the Judgment. On August 10, 2015, Dao timely filed a Notice of Appeal.[15]

II. POINTS OF ERROR

On secondary appeal, Dao raises three points of error, contending that: (1) the DPP's imposition of a fine for an illegal transient vacation rental was clearly erroneous when there was no evidence at that time that the Property was rented in violation of the law, pointing to both NOO #1 and NOO #2; (2) the DPP's imposition of a $64,000 fine was clearly erroneous when the only possible probative evidence presented was that there was one rental for a four-day period, again pointing to both NOO #1 and NOO #2; and (3) the DPP's interpretation of a "continuing violation" in the context of a transient vacation rental is

---

[15] An earlier appeal was dismissed for lack of appellate jurisdiction because a final judgment had not yet been entered.

21

arbitrary, capricious, in violation of statutory principles and an abuse of discretion, again referencing both NOO #1 and NOO #2.

III. APPLICABLE STANDARDS OF REVIEW

The appellate process applicable to this case has been described as follows:

> The ZBA is the administrative agency designated to hear and determine appeals from the director's actions in the administration of the City and County of Honolulu zoning code. Thus, the ZBA's order was an administrative decision subject to review by the circuit court.
>
> Review of a decision made by the circuit court upon its review of an agency's decision is a secondary appeal. The standard of review is one in which [the appellate] court must determine whether the circuit court was right or wrong in its decision, applying the standards set forth in HRS § 91-14(g) (1993) to the agency's decision.

Save Diamond Head Waters LLC. v. Hans Hedemann Surf, Inc., 121 Hawai'i 16, 24, 211 P.3d 74, 82 (2009) (citations omitted; format altered).

The Hawai'i Supreme Court has explained the parameters of agency appeals as follows:

> This court's review is . . . qualified by the principle that the agency's decision carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its consequences.
>
> HRS § 91-14(g) (1993) enumerates the standards of review applicable to an agency appeal and provides: Upon review of the record the court may affirm the decision of the agency or remand the case with instructions for further proceedings; or it may reverse or modify the decision and order if the substantial rights of the petitioners may have been prejudiced because the administrative findings, conclusions, decisions, or orders are:
>
> > (1)  In violation of constitutional or statutory provisions; or
> >
> > (2)  In excess of the statutory authority or jurisdiction of the agency; or
> >
> > (3)  Made upon unlawful procedure; or
> >
> > (4)  Affected by other error of law; or

> (5) Clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or
>
> (6) Arbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion.
>
> [FOFs] are reviewable under the clearly erroneous standard to determine if the agency decision was clearly erroneous in view of reliable, probative, and substantial evidence on the whole record.
>
> [COLs] are freely reviewable to determine if the agency's decision was in violation of constitutional or statutory provisions, in excess of statutory authority or jurisdiction of agency, or affected by other error of law.
>
> A COL that presents mixed questions of fact and law is reviewed under the clearly erroneous standard because the conclusion is dependent upon the facts and circumstances of the particular case. When mixed questions of law and fact are presented, an appellate court must give deference to the agency's expertise and experience in the particular field.

Curtis v. Bd. of Appeals, 90 Hawai'i 384, 392-93, 978 P.2d 822, 830-31 (1999) (citations and quotation marks omitted); see also In re Water Use Permit Applications, 94 Hawai'i 97, 118-19, 9 P.3d 409, 430-31 (2000).

> An FOF or a mixed determination of law and fact is clearly erroneous when (1) the record lacks substantial evidence to support the finding or determination, or (2) despite substantial evidence to support the finding or determination, the appellate court is left with the definite and firm conviction that a mistake has been made. We have defined 'substantial evidence' as credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion.

In re Water Use Permit Applications, 94 Hawai'i at 119, 9 P.3d at 431 (citations and quotation marks omitted).

IV.  DISCUSSION

Before addressing Dao's arguments, we briefly review the legal and regulatory schemes applicable here, beginning with the LUO. The purpose of the LUO, which may also be referred to as the City and County of Honolulu's zoning ordinance, is "to regulate land use in a manner that will encourage orderly

development in accordance with adopted land use policies, including the city's general plan, and development and sustainable communities plans, and, as may be appropriate, adopted neighborhood plans, and to promote and protect the public health, safety and welfare[.]" ROH § 21-1.20(a). This purpose is carried out, in part, through the establishment of various zoning district classifications, which are designated on zoning maps that are adopted by ordinance. See generally ROH Chapter 21, art. 3. The subject Property is within a residential district. Pursuant to the LUO's Master Use Table, transient vacation units are not permitted uses within residential districts, except that certain transient vacation units which have been in operation since 1986 are treated as nonconforming uses if various requirements were initially met by September of 2000, and nonconforming use certificates were then issued and thereafter periodically renewed. ROH Chapter 21, art. 3, Table 21-3; ROH § 21-4.110-1.

The Director is authorized to issue notices of violation and notices of order for violations of the LUO pursuant to ROH § 21-2.150-2 (2017), which provides:[16]

> **Sec. 21-2.150-2 Administrative enforcement.**
> In lieu of or in addition to enforcement pursuant to Section 21-2.150-1, if the director determines that any person is violating any provision of this chapter, any rule adopted thereunder or any permit issued pursuant thereto, the director may have the person served, by registered or certified mail or delivery, restricted delivery, return receipt requested, or by hand delivery with a written notice of violation and order pursuant to this section. However, if the whereabouts of such person is unknown and cannot be ascertained by the director in the exercise of reasonable

---

[16] The 2017 version of ROH § 21-2.150-2 reflects service requirements that were updated by Ordinance 17-40, but this version is otherwise unchanged from the previous enactment of this section.

diligence and the director provides an affidavit to that effect, then a notice of violation and order may be served by publication once each week for two consecutive weeks in a daily or weekly publication in the city pursuant to HRS Section 1-28.5.

(a)   Contents of the Notice of Violation.  The notice shall include at least the following information:
(1)   Date of the notice;
(2)   The name and address of the person noticed;
(3)   The section number of the provision or rule, or the number of the permit which has been violated;
(4)   The nature of the violation; and
(5)   The location and time of the violation.

(b)   Contents of Order.
(1)   The order may require the person to do any or all of the following:
(A)   Cease and desist from the violation;
(B)   Correct the violation at the person's own expense before a date specified in the order;
(C)   Pay a civil fine not to exceed $1,000.00 in the manner, at the place and before the date specified in the order;
(D)   Pay a civil fine not to exceed $1,000.00 per day for each day in which the violation persists, in the manner and at the time and place specified in the order.
(2)   The order shall advise the person that the order shall become final 30 days after the date of its mailing or delivery.  The order shall also advise that the director's action may be appealed to the zoning board of appeals.

(c)   Effect of Order--Right to Appeal.  The provisions of the order issued by the director under this section shall become final 30 days after the date of the mailing or delivery of the order.  The person may appeal the order to the zoning board of appeals as provided in Section 6-1516 of the city charter. However, an appeal to the zoning board of appeals shall not stay any provision of the order.

(d)   Judicial Enforcement of Order.  The director may institute a civil action in any court of competent jurisdiction for the enforcement of any order issued pursuant to this section.  Where the civil action has been instituted to enforce the civil fine imposed by said order, the director need only show that the notice of violation and order were served, that a civil fine was imposed, the amount of the civil fine imposed and that the fine imposed has not been paid.

ROH § 21-2.150-2.

Chapter 10 of the DPPRPP addresses enforcement of the LUO through a civil fines program, which is intended to encourage

compliance with the LUO and to facilitate corrections. <u>See</u>

DPPRPP § 10-1.[17] DPPRPP § 10-1.01 provides, in relevant part:

> § 10-1.01 <u>Issuance of order.</u> (a) The director may issue a notice of violation and order upon determining that there is a violation, or upon receipt of a notice of violation and documentation of the violation.
>
> (b) The director shall have the order served upon the violator. . . .
>
> (c) The order shall state separately each violation, the fine assessed for each violation, the date and method of payment of the fine, and all potential remedies associated with each violation, including the addition of any unpaid civil fine to certain taxes, fees and charges collected by the city. The order shall also state what corrective action is necessary, the date by which such action must be completed to avoid daily fines, and the amount of the daily fine, should a daily fine be assessed.

<u>See</u> City and County of Honolulu Department of Planning and

Permitting, <u>http://www.honoludpp.org/AboutDPP/WhatWeDo/</u>

<u>AdministrativeRules.aspx</u> (last visited January 29, 2019). DPPRPP

§ 10-2 provides guidelines for the Director's scheduling of time

periods for compliance. <u>Id.</u>

Regarding the amount of fines, DPPRPP § 10-3 provides,

in relevant part:

> § 10-3 <u>Administrative fines.</u> (a) Resolution of a violation includes correction of the violation and payment of civil fines to the city in the amount prescribed by the director in accordance with the following schedule and subsections (b) through (i).

---

[17]     DPPRPP § 10-1 states:

> § 10-1 <u>Purpose.</u> The express purpose of the civil fines program is to encourage compliance with the provisions of the Land Use Ordinance and facilitate corrections to violations. The civil fines program is not intended to be viewed as a source of revenue for the city. Therefore, within the parameters provided by this chapter, the director shall be entitled to assert appropriate flexibility in the administration of the civil fines program.

Schedule of Civil Fines

| Type of Violation | Fine |
|---|---|
| Use | $ 50 - 1,000 |
| Development Standards | 200 - 1,000 |
| Permit Conditions | 200 - 1,000 |
| Signs | 50 - 1,000 |
| Misrepresentations | 100 - 1,000 |

(b)     In general, the fine for an initial violation shall be the lowest for that type of violation.  However, in specifying the amount of the fine, the director shall consider the following:
(1)    The nature and degree of the violation.
(2)    Whether the violation involves a threat to public health and safety.
(3)    Whether there is income derived from the violation.
(4)    Whether there are multiple violations.
(5)    Whether it is a recurring violation as defined in § 1.1.

(c)     If the violation is recurring, then the fine shall be increased for each recurrence, up to the maximum of $1,000, according to the following schedule:

Fine Schedule for Recurring Violations

| Recurring Violation | Use/Sign | Devel. Standards/ Permit Conditions | Misrepre- sentations |
|---|---|---|---|
| First | $ 100 | $ 500 | $   250 |
| Second | 250 | 750 | 500 |
| Third | 500 | 1,000 | 750 |
| Fourth | 750 | 1,000 | 1,000 |
| Fifth | 1,000 | 1,000 | 1,000 |
| Sixth | 1,000 | 1,000 | 1,000 |

(d) The fine assessed by the order is payable whether correction of the violation is completed before or after the order becomes final.  If the order is appealed, the administrative fines imposed shall not be collected until after completion of the appeal proceedings.

(e) When a violation is not corrected by the deadline established in the order, the director may assess an additional fine of $50 to $1,000 for each separate day during which the violation remains uncorrected.  Daily fines may be increased quarterly up to a maximum of $1,000 per day, until the violation is corrected, in accordance with the following schedule:

Fine Schedule for Daily Fines

|  | Initial Daily Fines | 3rd Month* | 6th Month* | 9th Month* | 12th Month* | 15th Month* |
|---|---|---|---|---|---|---|
| Initial Violation | $ 50 | $ 100 | $ 250 | $ 500 | $ 750 | $1,000 |
| Recurrence: |  |  |  |  |  |  |
| First | 50 | 100 | 250 | 500 | 750 | 1,000 |
| Second | 100 | 250 | 500 | 750 | 1,000 | 1,000 |
| Third | 250 | 500 | 750 | 1,000 | 1,000 | 1,000 |
| Fourth | 500 | 750 | 1,000 | 1,000 | 1,000 | 1,000 |
| Fifth | 750 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 |

* From the date of the order

. . . .

> (g)    In determining the appropriateness of the fine, the director may consider the following:  nature and egregiousness of the violation, duration of the violation, number of recurring and other similar violations, effort taken by the violator to correct the violation, degree of involvement in causing or continuing the violation, reasons for any delay in the completion of the appeal, and other extenuating circumstances.

See City and County of Honolulu Department of Planning and Permitting, http://www.honoluludpp.org/AboutDPP/WhatWeDo/ AdministrativeRules.aspx (last visited January 29, 2019).

It does not appear that the DPPRPP rules contain any statements or procedures implementing, interpreting, or prescribing policies regarding what specifically constitutes the provision of a transient vacation unit within the meaning of ROH § 21-10.1 and what constitutes a sufficient corrective action. However, as the supreme court has noted:

> [I]n exercising its quasi-judicial function[,] an agency must frequently decide controversies on the basis of new doctrines, not theretofore applied to a specific problem, though drawn to be sure from broader principles reflecting the purposes of the statutes involved and from the rules invoked in dealing with related problems.
> . . . .
> Adjudicated cases may and do . . . serve as vehicles for the formation of agency policies, which are applied and announced therein[.]

In re Hawaiian Elec. Co., 81 Hawai'i 459, 467-68, 918 P.2d 561, 569-70 (1996) (citations and quotation marks deleted).

A.    The Evidence Supporting NOO #1

There are a number of facets to Dao's argument that there was no factual evidence to support NOO #1.  Dao argues that no violation was established based on the inspector's visit on October 12, 2011, because:  (1) the person who Labang spoke with refused to identify himself, thus leaving Dao unable to specifically respond to the allegation; (2) Dao testified that there was no such renter, but that he had allowed various friends to use the Property during the winter months and that the person at the Property on that day must have been a friend who had not paid any money; and (3) there was no evidence whatsoever that the unnamed person paid money to Dao.[18]

The ZBA found and concluded that the Director's issuance of NOO #1 was not based on an erroneous finding of a material fact.  The Director argues, *inter alia*, that Dao failed to carry the heavy burden to demonstrate that ZBA's finding was clearly erroneous in view of the "reliable, probative, and substantial evidence on the whole record."

Regarding Dao's first argument − that no violation was established based on Labang's October 12, 2011 discussion with an

---

[18]    In addition, Dao argues that even if there were evidence of a violation on October 12, 2011, the finding that the violation was not corrected within 30 days is clearly erroneous because there is no evidence that Dao was continuing to engage in transient vacation rentals after November 12, 2011, and that not renting the Property to anyone should constitute a correction of the violation.

unidentified person at the Property - we note Labang's testimony was as follows:

> I went out to [the Property] and I spoke to a gentleman who told me that he was renting the property from October 11, 2011 through October 13, 2011. I asked the gentleman if he would identify himself. He did not. He said also there was someone else renting the property upstairs but he did not know how long the person was renting for.
>
> . . . .
>
> I asked the person if he had a 30-day contract, rental contract. He said he did not.

(Format altered).

Labang also testified that the unidentified person said that the owner was not present at the Property. On cross-examination, Labang again stated that he spoke to a gentleman, who did not identify himself. Labang testified:

> I asked him if he was the owner of the property. He said he was not. I asked him if he was renting the property. He said he was. I asked him if the owner was present at the property. He said he was not. And I asked him how long he was staying. He gave me the dates he was staying. I asked him if he had a 30-day contract. He said he had no 30-day contract. And so based on that information, we issued the notice of violation.

(Format altered).

When asked by Dao whether he could give Dao any more information about the person, Labang responded, "I cannot tell you any more information about the person."

With respect to NOO #1, Ishikawa testified that the DPP received a telephone complaint regarding the Property on October 3, 2011, but Ishikawa declined to identify the complainant. Ishikawa testified that the October 3rd complaint was the first complaint received concerning the Property. There was no other testimony or evidence of the violation stated in NOO #1.

Under the clearly erroneous standard, the ZBA's finding and conclusion that the Property was being operated as a

transient vacation unit on October 12, 2011, thereby violating the LUO, must be upheld if it "supported by 'reliable, probative, and substantial evidence' on the whole record." Price v. Zoning Bd. of Appeals of the City and Cty. of Honolulu, 77 Hawai'i 168, 176, 883 P.2d 629, 637 (1994) (quoting In re Haw'n Elec. Light Co., 60 Haw. 625, 630, 594 P.2d 612, 617 (1979)). The record before the ZBA does not contain reliable, probative, and substantial evidence supporting its conclusion that an LUO violation, as set forth in NOO #1, in fact occurred on October 12, 2011. The only evidence in the record is Labang's testimony that an unidentified male, in essence, stated that a violation occurred. Labang reported no corroborating personal observations, did not talk to any of Dao's neighbors at that time, and did not otherwise investigate or seek to verify the unidentified man's statement. There are no details of a monetary transaction or other indicia of compensation or any other supporting details or evidence of any kind. We recognize that "[t]he admission of irrelevant or incompetent matter before an administrative agency does not constitute reversible error if there is substantial evidence in the record to sustain the agency's determination." See Surfrider Found. v. Zoning Bd. of Appeals, 136 Hawai'i 95, 107, 358 P.3d 664, 676 (2015) (citation omitted). However, in this case, there is no other evidence whatsoever supporting the ZBA's finding and conclusion concerning NOO #1. We cannot conclude that this evidence constitutes "credible evidence of a sufficient quality and probative value to enable a person of reasonable caution to support a conclusion."

See id.; cf. Price, 77 Hawai'i at 170, 176, 883 P.2d at 631, 637 (concluding there was substantial evidence of an LUO violation where the DPP inspector observed a lunch wagon operating illegally on the premises, with a menu and prices posted outside the wagon and people buying food, and a co-owner of the lunch wagon admitted to the inspector that food was being sold to the public). Therefore, on this basis, we vacate the Circuit Court's Judgment and the ZBA Order to the extent that they found and concluded that the Director's issuance of NOO #1 was not clearly erroneous and that Dao's appeal of NOO #1 must be denied.[19]

B.      NOO #2 and Dao's Continuing Violation Argument

In his first point of error, Dao also challenges the ZBA's findings and conclusions upholding NOO #2. However, Dao does not appear to argue on appeal to this court that the evidence supporting the violation cited in NOO #2 was of insufficient quality or probative value to establish any violation of the LUO; rather, Dao argues that there was no evidence of a "continuing violation" from the time that Labang visited the Property on January 11, 2012, until the DPP deemed the violation corrected as of April 2, 2012, which was based on an inspection that showed that Dao was occupying the Property as of April 2, 2012. This argument is also addressed, in part, in Dao's second and third points of error.

Dao argues that transient vacation rentals cannot be deemed "continuing violations" in the same manner that many other

---

[19]     Accordingly, we need not address Dao's other arguments concerning NOO #1.

types of LUO violations might be viewed as continuing violations. This argument is perhaps best understood, in the first instance, in a hypothetical context. The thrust of this argument is that transient vacation rentals are inherently transitory, and if a unit is rented out for three days and discontinued thereafter, then the LUO violation is continuing for three days and not for thirty days or sixty days or some other period of time. Whereas, for example, if a structure projects into a required yard or height setback, that violation arguably is continuing until the structure is removed or the violation is otherwise remedied.

The Director argues, *inter alia*, that there was sufficient evidence to support that an illegal vacation rental was being conducted during this period of time.[20] The Director further submits that once a notice of violation was issued, it was Dao's responsibility to demonstrate that there was no violation or that it was corrected, apparently relying on the cases cited elsewhere in its brief that an agency's decision "carries a presumption of validity and appellant has the heavy burden of making a convincing showing that the decision is invalid because it is unjust and unreasonable in its

---

[20]   The Director also submits that Dao failed to raise this argument, particularly as it relates to the computation of the fines, before the ZBA. However, Dao was self-represented before the ZBA, and upon review of the entire transcript of the ZBA hearing, it appears that Dao attempted to challenge the DPP's findings that he was in violation of the LUO for the entire period that he was assessed daily fines, as well as arguing that his actions should not be construed as violations of the LUO, and that he argued that the Director's actions in assessing the fines were arbitrary and capricious and a manifest abuse of discretion. Represented by counsel on appeal to the Circuit Court, Dao more specifically articulated this argument. On this record, we decline to resolve this appeal by concluding that Dao waived his challenge to the imposition of daily fines for the continuous 62-day period from January 31, 2012, through April 1, 2012. See, e.g., O'Connor v. Diocese of Honolulu, 77 Hawai'i 383, 386, 885 P.2d 361, 364 (1994) (stating preference that appeals be addressed on the merits).

consequences." See, e.g., Korean Buddhist Dae Won Sa Temple of Hawaii v. Sullivan, 87 Hawai'i 217, 229, 953 P.2d 1315, 1327 (1998) (citations omitted). This latter proposition is well-established in Hawai'i law. Nevertheless, if an agency's factual determination that a violation occurred and is continuing is not grounded in reliable, probative, and substantial evidence, including any reasonable inferences that may be drawn from that evidence, then the agency's decision may be determined to be clearly erroneous and therefore unjust and unreasonable in its consequences, warranting reversal or modification. See HRS § 91-14(g)(5); see also HRS § 91-14(g) (1)-(4) and (6) (setting forth other statutory grounds for the reversal or modification of agency orders). Accordingly, we turn to the LUO violation set forth in NOO #2, and the evidence supporting that violation.

NOO #2 described the violation as a "Transient vacation use on a residential property without a Nonconforming Use Certificate" and referenced NOV #2, which cited ROH §§ 21-3.70-1 and 21-4.110.1.[21] As set forth above, pursuant to ROH § 21-2.150-2, "if the director determines that any person is violating any provision of [Chapter 21 of the LUO], . . . the director may have the person served . . . with a notice of violation and order." DPPRPP § 10-1.01(c) requires, inter alia, that the order "state separately each violation [and] . . . what corrective

---

[21]    See n.4 above regarding the ordinances. NOV #2 stated the violation as: "THE DWELLING IS BEING USED AS A TRANSIENT VACATION UNIT. THE TRANSIENT VACATION UNIT DOES NOT HAVE A NONCONFORMING USE PERMIT. THIS IS NOT PERMITTED."

action is necessary[.]"[22] Thus, the violation constituted providing a dwelling unit or lodging unit for compensation to transient occupants for less than thirty days. See ROH § 21-10.1 (defining transient vacation unit; as set forth in n.2 above). NOO #2 further described the violation as a "1st Recurring Violation." DPPRPP § 1-1 defines recurring violation as "a repetition of the same type of violation of the [LUO] . . ., at the same location, by the same responsible party."

At the ZBA's August 9, 2012 contested case hearing on Dao's appeal from NOO #1 and NOO #2, the following evidence was adduced by the Director regarding the factual determination of the violation stated in NOO #2.[23]

Ishikawa testified that Dao does not have a nonconforming use certificate that would allow transient vacation rentals at the Property. He also testified that there were two complaints to the DPP, one on October 3, 2011, by an unnamed person, and one on January 10, 2012, by Farrell and Joanne Martin (**Martin**). Ishikawa also testified that he thought NOO #2 was based on the rental of the property by the Heath party.

Farrell testified that she has lived next door to the Property for over forty years and that she was one of the complainants on January 10, 2012. She testified that "in the old

---

[22] NOO #2 did not state what corrective action is necessary, other than to state "[c]orrect the violation;" NOV #2 stated "Restore the area immediately and complete all work within 0 days from the date of this notice." Dao does not challenge NOO #2 based on any alleged deficiency in the specification of the corrective action.

[23] Although Dao presented his witnesses first, we begin with the Director's witnesses, as the issue is whether the Director's factual determination regarding a violation was clearly erroneous.

days" hardly any cars went down the street and the number of cars has decidedly increased. Farrell said that in an eight-week period, there were about twenty-three different cars that stayed overnight at the Property, about three or four different cars a week overnight. She described them as rental cars, with people taking luggage out and then three or four days later putting luggage back into their trunks. Farrell's initial testimony was not specific as to the time frame of her observations, but she was asked whether between December of 2011 and the first part of March of 2012 there were "vast periods of time" when the Property was vacant; she responded no. Relatedly, Farrell was asked if the Property was vacant three out of four weeks for each of those months; again, she answered no.

Sheil testified that Martin is his wife and, since 2010, they have lived on a private, dead-end road that has eight houses, including Dao's Property. Based on Ishikawa's suggestion on January 10, 2012, Sheil and his wife began keeping track of the cars that stayed overnight at the Property. Sheil was asked about various leases, including the Strasser Lease that ran from December 22, 2011, to January 21, 2012. He noted that he was not keeping track until January 10, 2012, but his recollection was that he saw more than one car during that period. Between January 10 and 21, 2012, he observed four different cars overnight (not counting cars associated with Dao). Sheil was asked next about the period of the Heath Lease that ran from January 9, 2012, to February 7, 2012, and Sheil testified that there were thirteen separate cars observed overnight during that

period, none staying longer than seven days. Finally, Sheil was asked about the period of the Crane Lease that ran from February 6, 2012, for a period of thirty-one days. During that period, Sheil, his wife, or his neighbors logged fourteen different cars, none staying more than seven days. On cross-examination, Sheil testified they were rental cars, all recently-registered cars.

Labang testified that NOO #1 was determined to be corrected on January 4, 2012, based on Dao's transmission of the Strasser Lease and proof of payment. He was assigned to re-inspect the Property on January 11, 2012, based upon receipt of another complaint. He met with a gentleman, Heath, who explained that he was renting the Property from Dao for three days and that he did not have a 30-day contract. Labang testified that on February 2, 2012, Dao faxed him the Heath Lease and proof of payment, but that because the Heath Lease overlapped with the Strasser Lease, it was considered a violation of the LUO. Dao's explanation to Labang for the overlap was that he had rented out different parts of the house to different people.

Labang reinspected the Property on February 8, 2012, at Dao's request, and found Crane was there. Crane told Labang that he and his girlfriend were renting the Property from February 6, to February 10, 2012, and that he did not have a 30-day rental contract. On cross-examination, Labang testified that he did his next and final reinspection on April 2, 2012, and had no recollection of Dao calling much earlier than that date. On questions from the ZBA, Labang testified that, although the zoning would allow a two-family dwelling, the Property was only

37

permitted for a one-family dwelling. Labang further testified that none of the leases provided by Dao specified that the upstairs, the downstairs, or particular rooms were being leased.

In addition to the evidence adduced by the Director regarding the factual determination of the violation stated in NOO #2, parts of Dao's own testimony support the Director's factual determination.[24]

Dao testified that he provided Labang a rental agreement for a rental period from December 22, 2011, to January 21, 2012 (the Strasser Lease), as well as other leases for periods of at least thirty days. On cross-examination, Dao admitted that he does not have a nonconforming use certificate, but said that he rented out rooms pursuant to ROH § 21-5.550.[25] Dao testified that Strasser did not stay the entire period of the lease, but did not recall how long he stayed. Dao also testified that Heath did not stay the entire time of his rental period, which was from January 9, 2012, to February 9, 2012, but Dao did not recall how long he stayed. In addition, Dao testified that he did not believe Crane stayed the entire period of his rental agreement, which was from February 6, 2012, for a period of thirty-one days. Dao further testified that he had a prior understanding that Heath, Strasser, and Crane would be staying

---

[24] "[T]he credibility of witnesses and the weight to be given their testimony are within the province of the trier of fact and, generally, will not be disturbed on appeal." Tamashiro v. Control Specialist, Inc., 97 Hawaiʻi 86, 92, 34 P.3d 16, 22 (2001). Thus, we decline to review the weight and credibility determinations made by the ZBA.

[25] ROH 21-5.550 provides that "[a]ccessory roomers shall be limited to a maximum of three, provided the dwelling is also occupied by a family composed of persons related by blood, marriage or adoption, and is not used as a group living facility."

for less than thirty days, but Dao nevertheless entered into thirty-day agreements with each of them. When asked about the different sums charged to the renters, Dao also testified that the length of the stay can be a factor in how he calculated the lease amounts, as well as what room the renters occupied and whether the renters were acquaintances or friends of friends.

Based on this evidence, we conclude that the Director did not clearly err in NOO #2 in determining that a transient vacation unit use of a residential property without a nonconforming use certificate had occurred at the Property. Although not stated in any rules or written policies and procedures regarding transient vacation unit rentals, we conclude that, in this case, the Direct permissibly determined that notwithstanding the existence of written rental agreements for periods of thirty or more days, based on the parties' actual intent, understanding, agreement, and undertaking, Dao had in fact provided a dwelling unit or lodging unit to transient occupants for less than thirty days. See In re Hawaiian Elec. Co., 81 Hawai'i at 467-68, 918 P.2d at 569-70.

However, as we have concluded that the Director's issuance of NOO #1 was clearly erroneous and, as Ishikawa testified, there were no other notices or orders issued concerning the Property, we further conclude that the Director's finding of a recurring violation in NOO #2 was clearly erroneous.

This leaves Dao's argument that there was no evidence of a "continuing violation" from January 11, 2012, to April 2, 2012, as well as the fines themselves, which are discussed below.

As Dao argues, the nature of the LUO violation at issue here is a use violation. We hold that the LUO's prohibition of transient vacation rentals in residential districts is violated when, and only during the period that, the prohibited use occurs. No other conclusion is support by the LUO or the DPP's rules. Thus, for a determination that a violation of the LUO occurred for a continuous period of time to be upheld, there must be "credible evidence of a sufficient quality and probative value to enable a person of reasonable caution to support a conclusion" that the violation occurred throughout that period of time.[26] See Surfrider Found., 136 Hawai'i at 107, 358 P.3d at 676.

Here, in addition to the evidence that the Strasser, Heath, and Crane rentals constituted violations, the testimony of Farrell and Sheil, along with reasonable inferences therefrom, constitute substantial evidence of continuing violations from January 10, 2012, to some time in March of 2012. Farrell's testimony addressed the period between the end of December of 2011 and "the first part of March" of 2012. Sheil's testimony arguably addressed the 31-day period that ran from February 6, 2012. No witness was presented or other evidence whatsoever was adduced for any later period. Thus, we conclude that the Director's determination that a violation was continuing throughout the period from January 11, 2012, to April 2, 2012, is

---

[26] We note that the rules applicable to the Director specifically contemplate the issuance of a notice of violation and order for each violation, with escalating fines and increased daily fines for each recurring violation. See DPPRPP §§ 10-1.01(c), 10-3(b)(4 & 5), (c), (e), and (g). Although the Director elected not to do so in this case for the series of rentals underlying NOO #2, under these rules, the Director could issue multiple orders for recurring violations based on similar evidence.

not grounded in reliable, probative and substantial evidence, and is therefore clearly erroneous. Accordingly, the ZBA Order and the Circuit Court's Judgment must be vacated and remanded for a re-determination of the period of the violation.

C. The Fines Stemming From NOO #2

Dao argues that the fines levied against him must be reduced. We agree, but for the reasons stated herein.

The Director abused its discretion in levying fines against Dao for NOO #1, as the Director clearly erred in issuing NOO #1.

As to NOO #2, to the extent that the administrative and/or daily fines levied were based on the violation cited in NOO #2 being construed as a "recurring violation," the Director abused its discretion because, with the setting aside of NOO #1, NOO #2 is Dao's initial violation. In addition, the period of that violation must be redetermined. Assuming that the Director again determines that daily fines from January 31, 2012, to the end of the newly-determined period are warranted, the daily fines must nevertheless be limited to that period.

Finally, we note that, notwithstanding the discretion vested in the Director to determine an appropriate fine for a violation of the LUO, that discretion must be exercised within the parameters stated in the DPP's administrative rules. See DPPRPP § 10-1. For example, DPPRPP § 10-3(a) states a range of fines for use violations ranging from $50 to $1,000. While the $1,000 fine levied against Dao does not exceed that range, it appears inconsistent with DPPRPP § 10-3(b), which states that

"[i]n general, the fine for an initial violation shall be the lowest for that type of violation." Although the Director may vary the fine based on the considerations stated in DPPRPP § 10-3(b)(1-5), there are no reasons stated, either in NOO #2 or elsewhere in the record, for imposing the highest fine, rather than the lowest for the initial violation here.[27]

We further note that DPPRPP § 10-3(c) specifically contemplates an escalating schedule of administrative fines for *recurring* violations, from $100 for the first recurrence, $250 for the second, $500 for the third, $750 for the fourth, and $1,000 thereafter. The fine schedule in DPPRPP § 10-3(c) also reflects a slower graduation of fines for use violations, as opposed to, for example, violations of development standards or permit conditions. There is no explanation in the record for the degree of the departure from that schedule for the single violation for which Dao was properly cited, *i.e.*, the violation stated in NOO #2.[28]

Similarly, DPPRPP § 10-3(e) provides, *inter alia*, a schedule for daily fines, beginning at $50 a day for the first three months for an initial violation, increasing quarterly, until the daily fine reaches $1,000 a day in the fifteenth month. The same daily fine schedule is stated for the first recurrence,

---

[27] Only one of the five considerations is plainly applicable, *i.e.*, that there is income derived from the violation. The Director may have considered other factors, but the record is silent as to the Director's rationale for levying the maximum fine for an initial violation. The assessment of fines above the lowest level is not precluded, so long as reasons consistent with DPPRPP § 10-3 are provided.

[28] As noted above, with the setting aside of NOO #1, NOO #2 is DAO's initial violation, and therefore it cannot be considered a recurring violation.

and then is increased and accelerated for subsequent recurrences. Again, although the Director has discretion to determine the appropriateness of a fine based on considerations stated in DPPRPP § 10-3(g), in this instance there is no rationale stated for the degree of the Director's departure from the daily fine schedule for the single violation for which Dao was properly cited.

However, as the fines levied against Dao are vacated on other grounds and we are remanding this case for redetermination of the fines, we need not reach the issue of whether, in light of the DPP's rules stating its policies as to the imposition of civil fines, the fines levied against Dao were "[a]rbitrary, or capricious, or characterized by abuse of discretion or clearly unwarranted exercise of discretion." See HRS § 91-14(g)(6).

V.   CONCLUSION

For the foregoing reasons, the Circuit Court's Judgment and the ZBA's Order are vacated, and pursuant to HRS § 91-14(g), this case is remanded to the ZBA for further proceedings consistent with this Opinion.

On the briefs:

Peter Knapman,
for Respondent-Appellant/
 Appellant.

Krishna F. Jayaram,
Deputy Corporation Counsel,
City and County of Honolulu,
for Petitioner-Appellee/
 Appellee.